## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SYNTAX-BRILLIAN CORPORATION, *et al.*,[1] | Case No. 08-_____ (  ) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF GREGORY F. RAYBURN
## IN SUPPORT OF THE DEBTORS' CHAPTER 11
## PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

---

[1]    The Debtors are the following entities:  Syntax-Brillian Corporation, Syntax-Brillian SPE, Inc., and Syntax Groups Corporation.

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    EXECUTIVE SUMMARY ............................................................................. 4

III.   BACKGROUND ............................................................................................. 6

     A.     Overview of the Debtors.......................................................................... 6
     B.     Assets ....................................................................................................... 9
     C.     Financing History.................................................................................. 10
     D.     The Debtors Face Litigation Challenges and Allegations .................... 14
     E.     Pre-Petition Efforts to Find a Solution................................................. 18
     F.     Exhaustion of Options........................................................................... 24
     G.     The Debtors' Intentions in Chapter 11.................................................. 25
     H.     Summary ................................................................................................ 27

IV.   FIRST DAY MOTIONS................................................................................. 28

     A.     Motion of the Debtors for Order Directing   Joint Administration of Chapter 11 Cases................................................................................... 29
     B.     Application of Debtors for Order Pursuant to 28 U.S.C. § 156(c) Authorizing the Retention and Appointment of Epiq   Bankruptcy Solutions, LLC as Balloting, Noticing, and Claims Agent..................... 30
     C.     Motion of the Debtors for Order Authorizing the (A) Maintenance  of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Continued Use of Existing Cash Management System, and (C) Waiving Certain Investment and Deposit Guidelines .................... 31
     D.     Motion of the Debtors for Order (I) Authorizing Debtors to Pay (A) Certain Pre-Petition Employee Obligations, and (B) Pre-Petition Withholding Obligations, and (II) Directing Banks to Honor Related Pre-Petition Transfers ................................................................................ 32
     E.     Motion of the Debtors for Order (I) Authorizing the Debtors to Pay Pre-Petition Sales and Use, Franchise, and Similar Taxes and Regulatory Fees in the Ordinary Course of Business, and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto ................................................................................................... 33
     F.     Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities  from Altering, Refusing, or Discontinuing Service, (II) Deeming  Utilities Adequately Assured of Future Performance, and (III)  Establishing Procedures for Determining Adequate Assurance of Payment........................... 34
     G.     Motion of the Debtors for Order Authorizing the Debtors to  (A) Obtain Post-Petition Financing of Insurance Premiums  and Renewals Thereof, and (B) Pay Pre-Petition Premiums,   if any, Necessary to Maintain Insurance Coverage in Effect................................................................. 35

H.   Motion of the Debtors for Order Authorizing the Debtors to Pay Certain Pre-Petition Mechanics' Liens and Shipping and Warehousing Charges in the Ordinary Course of Business ........................................................................ 37

I.    Motion of the Debtors for Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Certain Pre-Petition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business ............................................................................................. 39

J.    Motion of the Debtors for Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code (A) Confirming the Debtors' Authority to Continue Letter of Credit Program Related to Orders Placed by Target Corporation, (B) Authorizing the Debtors to Take Related Actions in the Ordinary Course of Business, and (C) Granting Related Relief ......................................... 39

K.   Motion of the Debtors for Order Authorizing and Directing on an Emergency Basis, Payment of Pre-Petition Claims of Two Essential Vendors and Service Providers .......................................................................... 41

L.    Emergency Motion of the Debtors for an Order (A) Authorizing Debtors (i) to Obtain Postpetition Financing Pursuant to Sections 363 and 364 of Title 11 of the United States Code; (ii) to Grant Liens and Superpriority Claims; (iii) to Make a Partial Repayment of Prepetition Obligations; (iv) to Use Cash Collateral; and (v) to Obtain Postpetition Financing Pending Final Hearing; (B) Providing Adequate Protection; and (C) Scheduling Final Hearing ........................................................................................................ 43

M.   Motion of the Debtors for Orders (I)(A) Approving Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests Pursuant to Sections 105, 363(b), (f), and (m) of the Bankruptcy Code; and (B) Authorizing the Assumption, Assignment, and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Sections 363 and 365 of the Bankruptcy Code; (II) Approving Bidding Procedures, Break-Up Fee and Other Protections in Advance of Sale; and (III) Granting Related Relief ............................................................................. 45

V.   CONCLUSION ............................................................................................................ 47

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SYNTAX-BRILLIAN CORPORATION, *et al.*, | Case No. 08-_____ ( ) |
| Debtors. | (Joint Administration Pending) |

**DECLARATION OF GREGORY F. RAYBURN
IN SUPPORT OF THE DEBTORS' CHAPTER 11
PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

GREGORY F. RAYBURN hereby declares, under penalty of perjury, as follows:

1.      I am the interim Chief Executive Officer ("**CEO**") of Syntax-Brillian Corporation ("**SBC**") (collectively, with SBC's captioned affiliated Chapter 11 debtors and debtors-in-possession, the "**Debtors**"), and set forth the following in support of the Debtors' Chapter 11 petitions, and requests for relief filed contemporaneously herewith.

**I.
INTRODUCTION**

2.      I am a senior managing director and the practice leader of FTI Palladium Partners, the interim management practice of FTI Consulting, Inc., an international financial advisory firm ("**FTI**"). I am resident in our New York offices located at Three Times Square, Eleventh Floor, New York, New York 10036.

3.      I have more than twenty-five years of experience working with troubled businesses, and creating and maximizing value for stakeholders of troubled companies. I have served as chief restructuring officer or chief executive officer in several high profile distressed and restructuring situations including Muzak, aaiPharma, WorldCom, and Sunterra. I hold a Bachelor of Science in business and marketing, and a Master of Arts in accounting, both from

the University of Alabama.  I am a certified public accountant and a certified fraud examiner.  I have testified and have been qualified as an expert witness in federal and state courts on issues including business viability, valuation, strategic plan assessment, fraud, damages, and bankruptcy and reorganization.

4.      On the date hereof (the "**Petition Date**"), the Debtors commenced their Chapter 11 cases (the "**Cases**") by filing voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware.

5.      To minimize the adverse effects on their businesses as a result of the commencement of the Cases, the Debtors request, contemporaneously herewith, various types of relief in certain "first day" applications and motions (collectively, the "**First Day Motions**") filed herewith.  A list of the First Day Motions is annexed as **Exhibit "A"** hereto.  In the First Day Motions, the Debtors seek, among other things, to:  (a) establish procedures for the efficient administration of these Cases, (b) continue the Debtors' operations while in Chapter 11 with as little disruption as possible; (c) maintain the confidence and support of key constituencies and employees; (d) obtain debtor-in-possession financing and use of cash collateral upon consent of the lenders; (e) establish procedures for, and effectuate, the sale of substantially all assets of the Debtors' estates on an expedited basis; and (f) retain appropriate professionals.  Gaining and maintaining the support of the Debtors' key constituencies, including employees, customers and vendors, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption and erosion pending a sale, will be crucial to the success of the Debtors' efforts in Chapter 11 on behalf of their creditors.

6.    In addition to the personal knowledge that I have acquired while working with the Debtors, I also have knowledge of, and familiarity with, the Debtors' books and records, and financial and operational affairs.    I have also participated directly in communications and negotiations with the Debtors' secured lenders, vendors, customers, and others, and worked closely with the Debtors' personnel who handle business operations and financial management, as well as with the Debtors' outside counsel and other advisors.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, and other relevant documents, and other information prepared or collected by the Debtors' employees, or upon my opinion based upon my experience with the Debtors' operations and financial condition and those of the troubled companies.  In making the statements herein, based upon the foregoing, I have relied in part upon others to accurately record, prepare, and collect any such documentation and other information.

7.    I submit this Declaration in support of the Debtors' petitions and First Day Motions.  As CEO, I am authorized to submit this Declaration on behalf of the Debtors.

8.    If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge and review of documents, or upon my professional opinion.

9.    Part II of this Declaration provides an executive summary of these Chapter 11 Cases and the Debtors' strategy.  Part III of this Declaration describes in more detail the businesses of the Debtors, the developments which led to the Debtors' Chapter 11 filing and our goals in the Chapter 11 Cases.  Part IV sets forth facts relevant to consideration of the First Day Motions.

PHX 328,279,218.18

## II.
## EXECUTIVE SUMMARY

10.    The Debtors are designers, developers and distributors of high-definition televisions. Over the past year, the Debtors have faced a series of challenges for their businesses including the failure of a customer to pay for a large order, defaults under their credit facility and constrained liquidity. The problems faced by the Debtors are detailed further in Part III of this Declaration.

11.    In order to address the issues facing the Debtors' business, the Debtors undertook a series of activities designed to recapitalize the Debtors or provide another solution for the business. Initially, the Debtors focused on a capital raise either through a PIPE transaction or by raising capital from a supplier. The Debtors' efforts in this regard were unsuccessful largely due to the business issues described in more detail in Part III of this Declaration.

12.    On a parallel path to the capital raise, the Debtors undertook an evaluation of potential restructuring options with the existing lender or a sale. However, through the process of developing a business plan to support such a restructuring or sale, two problems quickly became apparent. First, the Debtors' cost of goods sold was simply too high for the business to make a sustainable margin. Second, the Debtors do not own or control their own technology, research and development. The technology, research and development are critical to operating the Debtors' business and, in the case of the Debtors, are owned by a third-party. These two issues resulted in the Debtors concluding that (a) a restructuring with the existing lender was not feasible, and (b) the universe of possible purchasers was relatively small as any potential purchaser would have to be in a position to solve the two problems described above.

13.    After reaching those conclusions, the Debtors tried to identify potential purchasers with the ability to solve the identified problems. We concluded that the only possible

4

purchasers were suppliers to the Debtors.  We identified several suppliers who (a) might have the resources to solve the high cost of goods sold, and (b) could provide or would be willing to purchase the Debtor's technology.  We spoke with several suppliers of the Debtors.  Two of the Debtors' suppliers expressed interest in a transaction but only one of them ultimately negotiated a deal.

14.    The results of that process led to the purchase transaction described herein.  As set forth below, the principal of the proposed purchaser, Olevia International Group, LLC, a California limited liability company (the "**Purchaser**"), an affiliate of TCV Industrial Co., Ltd. ("**TCV**"), has already directly or indirectly purchased a controlling interest in the technology, research and development provider to the Debtors.  The Purchaser also has the ability to leverage its network to reduce the high costs of goods sold.  The Debtors believe that the Purchaser is the only possible buyer for the Debtors' assets.  In addition, consummating the sale quickly is critical to the Purchaser because of the need to capture the holiday sales.

PHX 328,279,218.18

**III.**
**BACKGROUND**

A.    <u>Overview of the Debtors[2]</u>

15.    SBC is a publicly-traded Delaware corporation headquartered in Tempe, Arizona and City of Industry, California.  SBC and its affiliated Debtors, Syntax-Brillian SPE, Inc. and Syntax Groups Corporation ("**Syntax Groups**"), collectively form an organization of leading designers, developers, and distributors of high-definition televisions (HDTVs) utilizing liquid crystal display (LCD) and, formerly, liquid crystal on silicon (LCoS) technologies.

16.    I am informed that originally, Syntax Groups was founded as a privately held company in 2003 and that in early 2004, Syntax Groups commenced shipment of Ölevia brand widescreen HDTV-ready LCD televisions in the United States.  The Debtors' public filings indicate that in March 2004, Syntax Groups joined with South China House of Technology ("**SCHOT**"), a Chinese distributor, to distribute HDTVs to the Asia-Pacific market and at the same time Syntax Groups entered into an agreement with Taiwan Kolin Co., Ltd. ("**Kolin**") for the manufacture of HDTVs.  It is my understanding that at the time Syntax Groups and Kolin entered into agreements governing marketing, technology research and development, and customer incentives.  In addition, it is my understanding that Syntax Groups, Kolin and DigiMedia Technology Co., Ltd. ("**DigiMedia**") entered into a strategic alliance through the acquisition by both Syntax Groups and Kolin of the stock of DigiMedia; Syntax Groups later divested its direct stake in DigiMedia as part of a set of strategic transactions.

17.    In November, 2005, Syntax Groups merged with Brillian Corp., a public company, and traded thereafter on NASDAQ as Syntax-Brillian Corporation, ticker symbol BRLC.

---

[2] To the extent historical, this information comes from a review of the Debtors' public filings.

(i)    Ölevia

18.    Under its "Ölevia" brand name, SBC traditionally sold HDTVs in a broad array of screen sizes to international, national, regional, and online consumer electronics retailers and distributors. Through these sales channels, SBC sold HDTVs designed to meet the individual needs of a variety of end-user consumers, including consumers in the price-conscious, high-performance, and high-end home theater markets. SBC focused primarily on developing its market position in North America and China.

19.    In order to best address the price and performance requirements of its sales channel customers and end-user consumers, SBC established a virtual manufacturing model to produce HDTVs utilizing components sourced in Asia, third-party contract manufacturers located in Asia, and third-party assemblers located in close proximity to end-user consumers. In addition, SBC developed a deep systems-level expertise that allowed it to deliver a high level of performance and reliability in its products. The overall result was intended to be a scalable business model that was designed to reduce SBC's capital expenses and enable it to concentrate on product design, marketing, research and development, and technological advances.

20.    SBC's business was dependent upon a manufacturing arrangement with Kolin under which Kolin produced the electronic components and subassemblies for SBC's LCD televisions. SBC and Kolin jointly selected and qualified vendors for LCD panels, electronic components, and subassemblies that Kolin did not itself manufacture, and SBC negotiated terms and conditions of orders and contracts with these vendors.

21.    At this point, the Debtors have terminated their operations in Tempe, Arizona. The wind-down has left only approximately eight employees, in reduced space, in Tempe, consisting primarily of SBC's chief financial officer, the general counsel, and the financial staff.

7

22.     SBC has a relationship with DigiMedia which provides to SBC key technology, research and development services.  DigiMedia owns and controls the technology which is necessary for the conduct of SBC's business.  DigiMedia conducts ongoing research and development programs regarding digital imaging products that focus on advancing its technologies, developing new products, improving design and manufacturing processes, and enhancing the quality, performance, and cost-effectiveness of its products.

23.     In April 2006, SBC entered into a strategic relationship with China South Industries Group Corporation ("**China South**"), a state-owned enterprise directly under the administration of China's central government.  The strategic relationship resulted in a joint venture, Sino-Brillian, which the Debtors still own.

24.     On July 10, 2006, the Debtors acquired a 19.5% interest in Ölevia Senna de Brazil, a joint venture in Brazil, to introduce their products in the Latin American markets.  The Debtors similarly hold a 16.7% interest in Ölevia Japan, and a 16.0% interest in Nanjing Huahai Display Technology in China.

(ii)     Vivitar

25.     Vivitar Corporation ("**Vivitar**"), acquired by SBC in 2006 is a wholly owned subsidiary of SBC, headquartered in Leicester, UK.  Vivitar had approximately 60 full-time, direct employees as of June 25, 2008.  Vivitar is not a Debtor herein.  Efforts are under way to separately market Vivitar for sale.

26.     Vivitar is a leading supplier of both film cameras and a broad line of digital imaging products, including digital cameras, "point and shoot" cameras, 35 millimeter single lens reflex cameras, auto focus cameras, digital video recorders, multimedia players, flash units, binoculars, projectors, and camera accessories.

PHX 328,279,218.18

27. Vivitar's digital imaging products are marketed through a direct sales force and through independent dealers and distributors. The United States, France, Hong Kong and the United Kingdom currently constitute the principal markets for Vivitar's digital imaging products. Vivitar maintains sales offices in the United States, France, Hong Kong and the United Kingdom. Vivitar has been generally near-self-sufficient financially, but dependent upon the Debtors for certain infrastructure for which both Vivitar and the Debtors account.

**B.** **Assets**

28. The Debtors operate out of two buildings in City of Industry, both leased, and leased office space in Tempe. As of the Petition Date, the Debtors had approximately 109 full-time, direct employees based in the City of Industry, California, and in Tempe, Arizona in sales, warehouse and repair, financial, technology, and administration. The Debtors also maintain approximately 53 full-time temporary employees in the City of Industry furnished through one or more manpower procurement agencies; these workers are primarily warehouse and repair personnel. The Debtors' business activity and volume are far reduced from what they were several months or a year ago. Several divisions and product lines have been sold or discontinued. The Debtors have increased the direct shipping of inventory from the overseas assembler to the retail (usually big box store) customer for sales to public consumers, and thus decreased the number of employees necessary to operations. The Debtors are preparing to make additional space and staff reductions; the decision to do so is driven by operational needs and in anticipation of sale.

29. The Debtors also operate a remote call center in Malaysia, through a vendor, A Domain. The call center employs approximately 37 individuals trained to help customers with repairs, returns and technical inquiries.

PHX 328,279,218.18

30. The Debtors rely on a variety of intellectual property methods, including patents, trade secrets, trademarks, confidentiality agreements, licensing agreements, and other forms of contractual provisions, to protect that intellectual property. The Debtors hold patents in various technological arenas, including display technologies, optical system illumination technologies, and display drive electronics.

31. The Debtors currently have trademarked three brand names. The "Brillian" trademark describes the microdisplay product itself. The "Vivitar" trademark is used in the digital imaging product market. The Debtors have pending trademark applications for IDEA, iDiva, Ölevia, and Syntax.

## C.    Financing History

32. The following is presented upon information and belief, and upon reliance on others familiar with the Debtors' books and records, financial operations, affairs and history.

33. The Debtors undertook a number of stock issuances and capital raises including a $15 million raise in March, 2006; an issuance to Kolin of 3,000,000 shares, amounting to 6.2% of shares then-outstanding, of common stock and a warrant to purchase 750,000 shares of SBC common stock for gross proceeds of $15,000,000; a private placement of $10 million to a supplier in December, 2006; a $15.5 million private placement to TCV or its affiliate in March, 2007; a public offering of $142.6 million on May 30, 2007 (of which $20.2 million was used to repay and reduce outstanding indebtedness); and a private placement of $20 million to TECO Electric & Machinery Co., Ltd. ("**TECO**"), a supplier, in August 2007; for a total of approximately $328 million in equity raised.

34. More recently, SBC has primarily financed its business operations through the following loan facilities and financing agreements.

35.     The Debtors, certain lenders, and Silver Point Finance, LLC, as administrative agent, collateral agent, and lead arranger ("**Silver Point**," and together with its lender participants, the "**Pre-Petition Lenders**") entered into that certain *Credit and Guaranty Agreement*, dated October 26, 2007 (the "**Credit Agreement**"), for (1) a term loan in the aggregate principal amount of $150,000,000, consisting of two tranches, (a) a $110,000,000 term loan (the "**Tranche A Term Loan**") and (b) a $40,000,000 term loan (the "**Tranche A-1 Term Loan**"), and (2) a revolving credit facility in the maximum commitment of $100,000,000 (the "**Revolving Loan**").    Each of the Tranche A Term Loan and the Tranche A-1 Term Loan maturity is the date that is the earliest to occur of (x) October 26, 2012, and (y) the date that all Tranche A Term Loans or Tranche A-1 Term Loans, as applicable, shall become due and payable in full under the Credit Agreement, whether by acceleration or otherwise.    The Revolving Loan matures on the date that is the earliest to occur of (i) October 26, 2012, (ii) the date the revolving commitments are permanently reduced to zero pursuant to certain terms of the Credit Agreement, and (iii) the date of the termination of the revolving commitments pursuant to the Credit Agreement.

36.     Borrowings under the Credit Agreement bear interest at the applicable base rate (the "**Base Rate**") plus 5% or LIBOR plus 6%.    The Base Rate is equal to, for any day, a rate per annum equal to the greater of (1) 5% per annum, and (2) the greater of (a) the prime rate in effect on such day, and (b) the federal funds effective rate in effect on such day plus 1%.    Any change in the Base Rate due to a change in the prime rate or the federal funds effective rate shall be effective on the effective day of such change in the prime rate or the federal funds effective rate, respectively.

PHX 328,279,218.18

37.     The obligations under the Credit Agreement are secured by a first-priority blanket lien on substantially all of the Debtors' assets, including a pledge of all of the capital stock of each of the Debtors' domestic subsidiaries and 65% of all the capital stock of each of first-tier foreign subsidiaries, pursuant to a pledge and security agreement entered into with Silver Point. The obligations under the Credit Agreement are also guaranteed by the Debtors' domestic subsidiaries under terms contained in the Credit Agreement.

38.     The Credit Agreement has been in default since December 24, 2007. Since then, there have been payment defaults under the Credit Agreement, amendments and several forbearance agreements, and interim borrowings. As of the Petition Date there is approximately $73,619,027 owing on the Tranche A Term Loan, $36,533,333 owing on the Tranche A-1 Loan, and approximately $1,525,000 owing on the Revolving Loan, for a total of approximately $111,677,606, plus other amounts including interest and the "Make Whole" amount.

39.     On or about June 26, 2007, the Debtors also entered into that certain *Promissory Note* (the "**Note**"), as amended by that certain *Agreement*, dated December 21, 2007 (the "**Amendment**"), in favor of Preferred Bank in the total amount of $17.8 million. The Note bore interest at Preferred Bank's prime rate plus 0.50% and was to mature on May 5, 2008 (pursuant to the Amendment). The Note was secured by a cash collateral account maintained by Kolin but was not secured directly by the Debtors. On June 26, 2008, Preferred Bank applied cash collateral of Kolin to pay off in full the obligations evidenced by the Note which were then approximately $14 million.

40.     Additionally, pursuant to that certain *Amended and Restated Promissory Note Variable Rate*, dated July 26, 2007 (the "**AR Note**"), a prior $2,000,000 note entered into on December 1, 2006, was amended and restated in the amount of $4,000,000. The AR Note bears

12

interest at Preferred Bank's prime rate plus 0.50% and matures on December 5, 2008. The AR Note is secured only by personal guarantees of three of SBC's former directors and/or executive officers, and remains outstanding.

41.    On November 22, 2006, the Debtors entered into an amended and restated factoring agreement with The CIT Group/Commercial Services, Inc. ("**CIT**").  Under the so-called factoring agreement, the Debtors sell and assign collection of accounts receivable to CIT, subject to CIT's approval, and CIT assumes the credit risk, and obtains insurance, for all accounts approved by CIT.  The Debtors pay fees to CIT of 0.30% or 0.20% of gross invoice amounts, depending on whether CIT assumes credit risk, plus 0.25% for each 30-day period in which invoices are outstanding, subject to a minimum fee per calendar quarter of $112,500.  Of these factored accounts, 60% of all proceeds received from CIT for factored accounts are applied to advances under our credit facility with Preferred Bank.  In addition, the Debtors may request that CIT advance up to $15.0 million to the Debtors based on the accounts receivable of two of our customers.  The Debtors granted a security interest in accounts receivable to CIT to secure the obligations to CIT under the factoring agreement.  CIT has filed a UCC lien statement which protects CIT on any amounts owed to it.  The Debtors terminated the CIT agreement pre-petition and have established procedures to collect and allocate outstanding accounts receivable subject to the agreement.

42.    On April 26, 2007, the Debtors entered into a term loan agreement with CIT for a loan in the principal amount of $20 million.  The loan bore interest at prime plus 0.5% with interest paid monthly.  All amounts outstanding under this loan would mature on the earliest to occur of (i) September 30, 2007, (ii) the closing of a financing with CIT or other third party, or (iii) the date of any new equity financing.  This loan was secured by CIT's existing lien on

accounts receivable and other assets under the factoring agreement and was also personally guaranteed by two directors and executive officers and the Vice Chairman of Kolin. This loan was repaid in May, 2007 from the proceeds of a public offering.

**D.      The Debtors Face Litigation Challenges and Allegations**

      (i)      Chinese Government Issues; Credit Agreement Default

43.     In or about the fall of 2007, approximately 26,000 custom, large screen HDTVs originally sold to SCHOT and OFE were in turn sold to the Chinese government for future installation in the Olympic Village. The Chinese government intended to mount large screen televisions in the Olympic venues and in the Olympic Village to maximize viewership in the Olympic locales. The Debtors manufactured the custom HDTVs through Kolin. The custom HDTVs were delivered to the Chinese government in or about the fall of 2007. The Chinese government then allegedly refused to pay for the HDTVs until ultimate installation which was significantly delayed. SCHOT, OFE and Kolin entered into an agreement to take back the units. They were retrieved by Kolin.

44.     The Debtors and Kolin undertook to determine whether the returned units could be (a) sold in the Asian-Pacific market with the existing components built to Chinese government standards, and given the custom, large size of the televisions, (b) held for later delivery to the Chinese government, or (c) re-tooled for sale in United States markets (Chinese tuners would have to be removed and replaced to comply with United States import regulations). SCHOT apparently purchased some of this inventory but then sought to return it.

      (ii)      SBC and its Suppliers Face Liquidity Crunch

45.     Upon the Chinese government's refusal to accept the HDTVs, SBC's receivable, anticipated to be approximately $63 million, became uncollectable. The receivable was excluded from SBC's borrowing base under the Credit Agreement. Reportedly, some of the refused

14

inventory was sold by Kolin, some was maintained in inventory, some was shipped to customers and some is held in customs. SBC was denied control of the inventory. SBC experienced a considerable loss causing a severe decrease in liquidity.

46.     As a result of the refusal of the Olympics merchandise, including non-payment of the receivables due from SCHOT and OFE, the default under the Credit Agreement, and other events, by the first quarter of 2008, the Debtors and their suppliers faced a serious liquidity crisis. The Debtors, as borrower under the Credit Agreement, found their borrowing ability exhausted and the Pre-Petition Lenders exerting pressure. Moreover, the Beijing Olympics problem affected Kolin, SCHOT and other key players in the Debtors' supply chain. All involved found themselves with no program to adequately recoup the loss.

(iii)    SEC Inquiry

47.     SBC filed its SEC form 10-K disclosure for the period through June 30, 2007 (the close of the SBC fiscal year) on September 13, 2007 with Ernst & Young as its newly engaged auditors. A dispute with Ernst & Young followed; the auditor alleged that SBC's internal controls were lacking. Since then, the Debtors have publicly filed their statement that the reporting in the 10-K was unreliable.

48.     The Debtors received a letter of inquiry from the Securities and Exchange Commission (the "**SEC**"). The focus of the SEC inquiry is on various financial and accounting issues beginning July 1, 2005 including the accounting treatment of tooling deposits, cash advances to Asian manufacturers, outstanding accounts receivable, inventory returns, internal control issues and SBC's supply chain relationships in Asia. The Debtors have responded, and are communicating with the SEC, through counsel. No formal investigation has been commenced as far as the Debtors are aware. The Debtors, through an independent director and

15

the audit committee of the Board of Directors, interim management and outside professionals, are conducting certain investigations into the allegations.

(iv)     Deflation in Value of SBC Stock

49.     SBC's stock has traded on NASDAQ. SBC's operational difficulties have been reflected in the value of its stock.

50.     The stock traded at over $6.00 in September 2007, in the $4.00 to $5.00 range in October 2007, in the $2.00 to $3.00 range for much of December 2007 through early February 2008, then sunk to about $1.00 for most of the third quarter and finally to the 50-cent range in the last several weeks. On July 1, 2008, SBC received a letter from NASDAQ notifying that for the prior thirty consecutive trading days the common stock closed below the minimum $1.00 per share requirement for continued inclusion under marketplace rule 4450(a)(5). SBC does not intend to attempt to regain compliance and expects that the common stock will be de-listed.

(v)     Class Actions

51.     Four consolidated class action complaints have been filed in the United States District Court for the District of Arizona against SBC and several of its former officers and directors. The complaints allege violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and of Rule 10b-5 of the rules promulgated thereunder arising out of certain allegedly false statements and omissions of material facts in SBC's public filings with the SEC during the class period. A claim has been filed with the Debtors' directors and officers liability insurance carrier for coverage of the case. The carrier is defending the case under a reservations of rights. The case is in the earliest stage; no consolidated complaint has been filed by the plaintiffs and no responsive pleading or other response has been filed by the defendants.

16

(vi)    <u>Derivative Complaints</u>

52.    An alleged shareholder filed a derivative complaint in Arizona state court against SBC and several of its former officers and directors. The complaint purportedly was filed on behalf of SBC and alleges that the individual defendants violated their fiduciary duties under Delaware state law in connection with alleged accounting deficiencies of SBC, the making of allegedly false and misleading statements in SBC's SEC public filings, and with the sale by certain former directors of shares in SBC's publicly-traded stock. The claims asserted in the derivative complaint are assets of the estate. A claim has been filed with the Debtors' directors and officers liability insurance carrier for coverage of the case. The carrier is defending the case under a reservation of rights. The case is at earliest stage and no responsive pleading or other response has been filed by the defendants.

(vii)    <u>Funai Litigation</u>

53.    The Debtors participate in a joint defense agreement with other defendants in International Trade Commission litigation initiated by private complaint in federal court and transferred to the Commission for investigation and prosecution. The claim of Funai Electric Co., Ltd. (and others) surrounds alleged unauthorized use of protected technology of other parties; there are over a dozen defendants. The Debtors have responded by vigorously defending the action, and deny any liability or wrongdoing. The Debtors anticipate that they will continue defense of this matter post-petition to maintain the value of the assets at least pending a sale.

(viii)    <u>Patent Infringement Actions</u>

54.    There are claims pending in the federal courts, and claims threatened by several parties with respect to patent infringement and similar claims. This is typical for a highly competitive business that relies upon protected technologies of its own, and a business environment that encourages competitors to sue to seek additional revenue.

17

(ix)     FCC Litigation

55.     The United States government has recently modified the requirements for the sale of certain HDTV components in the United States.  The Federal Communications Commission (the "**FCC**") has alleged that SBC may have violated certain FCC rules with respect to technical requirements for selling televisions containing high-definition tuners.  SBC denies that it has violated FCC rules.

(x)     TECO Litigation

56.     TECO has filed a complaint in the United States District Court for the District of Arizona against SBC for damages allegedly arising out of the $20 million private placement described above in paragraph 33 of this Declaration.  The complaint seeks rescission of the private placement agreement, disgorgement of the $20 million investment or, alternatively, an award of compensatory damages and interest.  The complaint was recently filed and no answer or other response has been filed.  A claim for coverage has been filed with the Debtors' insurance carrier.

**E.     Pre-Petition Efforts to Find a Solution**

(i)     Management and Directorship Changes

57.     During the last several months, SBC has experienced resignations from its board of directors and has vested an independent director with authority over the investigation and the Chapter 11 filing.  SBC's president and chief executive officer, James Li, was terminated, and its chief financial officer was replaced.  The Debtors have retained FTI personnel as interim executives.  It has retained additional support of counsel and other outside advisors.

(ii)     ThomasLloydCapital Retained to Seek Investment

58.     In the fourth quarter of 2007, the Debtors retained ThomasLloydCapital, LLC, an investment banking firm based in New York, to seek out an investment transaction in order to adequately capitalize the Debtors in the form of a PIPE or by raising capital from a supplier. The Debtors engaged in negotiations with one party identified by ThomasLloydCapital. Nevertheless, the parties could never reach agreement on a term sheet acceptable to the Debtors.[3] The Debtors' efforts to raise capital were unsuccessful largely due to the business issues addressed herein. The Debtors terminated their relationship with ThomasLloydCapital prior to the Petition Date.

(iii)    Reduction in Workforce

59.     In order to reduce costs, the Debtors have reduced their workforce substantially over the last several months. They have also reduced the number of temporary workers that are procured through manpower agencies.

(iv)     Opportunity for Internal Restructuring Examined

60.     The Debtors attempted to develop a model for an internal restructuring including a re-negotiation of the secured debt. However, due to the high cost of goods sold and costs associated with research and development, and given that the Debtors have no control over the research and development entity, which is necessary to a stand-alone business model, a suitable business model could not be developed. The Debtors created financial models assuming lower sales and administration expenses and sales to higher volume and higher profit customers. Financial accommodations intended to reduce the need for outside financing were assumed. In

---

[3]     ThomasLloydCapital LLC reports that it approached or communicated with the following financial players: Iroquois; Enable; Rockmore; Hudson Bay; PEM Group; Sage; DE Shaw; Highbridge; York; Ramius; Midsummer; HBK; Ram; LH Financial; ComVest; and RWB.

19

all scenarios the high cost of goods sold and inability to control research and development precluded a profitable business model.

    (v)    <u>Vivitar</u>

61.    SBC coordinated various efforts to capitalize upon the value of Vivitar, its wholly owned subsidiary. Upon consultation with the Debtor's Pre-Petition Lenders, SBC retained the services of Qorval, LLC ("**Qorval**") as a financial professional. SBC also retained the services of KPMG Capital Finance LLC ("**KPMG**") to explore a sale of Vivitar.

    (vi)    <u>Diversification of Supply</u>

62.    We diversified our sourcing for manufacturing. On April 3, 2008, SBC announced a strategic manufacturing agreement with Compal, under which Compal Electronics, Inc. ("**Compal**") would manufacture an initial order for 300,000 Ölevia LCD HDTVs at Compal's factories in Kunshan, China. Kolin, SBC's main supplier and manufacturer, would continue to leverage its network of suppliers, to assist Compal to source components as the best prices. DigiMedia, the research and development technology supplier to SBC, and an affiliate of Kolin, is to support Compal on SBC's behalf.

    (vii)    <u>Retention of FTI</u>

63.    As set forth above, to address exigent financial and operational issues and by agreement with the Pre-Petition Lenders, FTI commenced work with the Debtors in the first quarter of 2008. FTI was initially retained to assist the Debtors to provide information and reporting to Pre-Petition Lenders, including to create short-term budgets, negotiate appropriate waivers, and assess the available assets of, and options by which to improve, the Debtors. The dispute over the inventory dedicated to the Chinese Olympics, and the failure of the SCHOT and OFE to make good on approximately $68 million of obligations, drained the Debtors' resources and impacted domestic sales.

64.    FTI focused on operations and evaluating forecasts developed by the Debtors. We came up to speed with internal management and spoke with vendors, customers, and others to help assess the viability of the Debtor's business. We also worked to restructure and improve the Debtors' method of operations. We had customers furnish letters of credit to finance shipments entering the country from assembly overseas, reducing costs, labor, and delivery times. We dealt with a variety of other operational issues and implemented cost savings and excess staff reductions. In the course of FTI's work, it became apparent that even more resources were required. FTI personnel were added in various management and support positions to shore up the Debtors' capabilities. Later, I was retained as interim chief operating officer and then as interim CEO as of June 4, 2008.

(vii)    <u>Pre-Petition Sale Efforts</u>

65.    As set forth above in Part II, it became clear that an investor or purchaser would be found for the Debtors' business only if the party could enjoy synergies in the supply chain, as the overwhelming cost component to the Debtors' HDTVs are in the supply of the components.

66.    The Debtors approached Kolin, a key Taiwan HDTV supplier to the Debtors with which the Debtors have a variety of relationships. However, no offer has been forthcoming from Kolin, and none can be expected. The Debtors have major disputes with Kolin as discussed above, including over inventory of HDTVs manufactured by Kolin on behalf of the Debtors for the upcoming Beijing Olympics, delivery of which was refused by the Chinese authorities.

67.    The Debtors also had discussions with respect to a potential transaction with a financial party. The party has not executed (and has informed it will not execute) a non-disclosure agreement. Rather, it made a preliminary, exclusive stalking horse and break-up fee proposal and sought a substantial fee to undertake diligence, leading us to conclude that this is an

21

entity seeking a stalking horse fee, not a transaction to benefit the estates. Negotiations were not fruitful.

68.    The Debtors had several conversations with Compal to explore a potential equity infusion or transaction. The Debtors approached Compal believing that, as a manufacturer in SBC's supply chain, Compal could benefit from supply chain efficiencies. Compal and the Debtors negotiated toward a term sheet but ultimately no agreement was reached.

69.    We also reached out to TCV, a Taiwanese manufacturer of plastic molds and has highly-developed skills and technology in the production of complex molds for a variety of industries. I am informed that TCV (directly or through affiliates) holds major interests in three Taiwanese public companies and various private entities. TCV, a privately held company established in 1977 with operations in Taiwan, China, Japan, Australia and Hong Kong, is the leading specialist OEM manufacturer for injection/painting and tooling in Taiwan for automotive and motorcycle parts, as well as one of the largest toy, battery operated small vehicle product manufacturers (OBM/OEM) in the world, shipping to more than 68 countries with more than 18% of the global market.

70.    In 2003, the TCV group initiated a flat panel television OEM business, and has become one of the leading LCD television plastic injection OEM manufacturers in Taiwan and China. The TCV group maintains a production capacity of more than 800,000 plastic cabinet sets for LCD television at its operations in Taiwan and China. TCV provides in-house design from initial concept through to prototype and mechanical solutions with 2D/3D drawings, CAD/CAM, tooling, precision injection, coating and assembly.

71.    Initially, we discussed the potential for an investment in the Debtors; TCV previously made an investment in HDTVs. However, the discussion turned to an acquisition and

assumption of debt transaction. TCV has informed us that it believes it can achieve savings in the purchase of the "Ölevia" brand product line and increase its market share and profitability as a manufacturer. As set forth above, TCV not only is a manufacturer of the Debtors' HDTVs but it also does business with other of the Debtors' suppliers, and thus has an interest in stabilizing and maximizing efficiencies in the supply chain in Taiwan.[4]

72.    Diligence has been undertaken with TCV. Meetings, both in the United States and Taiwan, have been held to work on the terms of the transaction. Documents have been exchanged. Negotiations have been undertaken with the Pre-Petition Lenders and Post-Petition Lenders and the Debtors are satisfied with the *bona fides* of the Purchaser. We believe that TCV has the financial wherewithal to undertake the transactions contemplated and it is unique among the parties in the supply chain in that respect. The transaction with TCV meets with the approval of the Pre-Petition Lenders and Post-Petition Lenders including as evidenced by the agreement to extend post-petition financing in support of continuing operations through and including the sale process.

73.    The Debtors' assets are subject to diminution in value unless sold quickly. The Debtors believe the Purchaser to be an acceptable and capable purchaser. I am informed that TCV's models also show that it will be able to provide approximately $45 million in working capital for the newly-acquired business post-transaction. New funding will be necessary to support and improve the operation of the business. Mr. John Wu and one of his family members have acquired a 51% interest in DigiMedia, the technology, research and development arm of the Debtors' operations. This is a critical component of the overall transaction, as without

---

[4]   Mr. Jung-Jyh Wu a/k/a John Wu, the President and Chief Executive Officer of TCV, and Leader Investment Co., Ltd., another supplier, made a $10 million investment in SBC on or about December 1, 2006, in exchange for 1,293,661 shares of common stock and warrants to purchase 64,683 shares of SBC common stock. Thus, while TCV is not an equity holder of SBC as far as I can ascertain, its chief executive is or was.

DigiMedia, a purchaser would not control the research and development technology associated with the Ölevia brand.

74.     As discussed above, other parties in the supply chain have been approached to consider an opportunity here, and have declined. Some have no interest, and some have no resources with which to effectuate a transaction. Competitors at the low end of the product range are financially unable to assume the burden of the Debtors' businesses; competitors in the higher ranges already have vertical integration, and have no incentive to invest in a lower-end competitor.

**F.      Exhaustion of Options**

75.     In the event no sale is approved, or a sale is substantially delayed, the value of the assets will likely erode quickly. Continued financing is required to sustain operations. Absent sale, existing parts and inventory will be of little value; American retailers will not accept large quantities of inventory without the backing of the supplier who is responsible for warranty, returns, repairs, price protection, and other normal elements of the supplier-retailer relationship. Property, plant, and equipment are worth little. There is no real estate owned. Employees will quickly transition to other opportunities. Accounts receivable will be difficult to collect absent ongoing relationships.

76.     Thus, the time for a sale transaction is now. The Purchaser has the appetite and wherewithal for a transaction. The lenders are in place with financing. A transaction now is valuable to a buyer who intends to gear up for traditional fourth-quarter retail sales. Delay will diminish the value of the transaction.

77.     At this point, the factors and events described above have contributed to the impairment of the value of the Debtors' business, including the defaults under the Credit

Agreement, the SEC inquiry, the decrease in the value of the SBC public stock, and the loss of confidence of suppliers, vendors and employees.

78.     Thus, the Debtors contemplated a Chapter 11 filing.  We negotiated with the Pre-Petition Lenders to continue funding to assure liquidity pending a transaction to be undertaken in Chapter 11.  Chapter 11 would provide the Debtors an opportunity to effectuate a quick sale process that would satisfy the Pre-Petition Lenders to the extent possible, and achieve the highest and best value for the Debtors' assets.  Absent Chapter 11, further erosion of the Debtors' business and relationships was certain.

## G.    The Debtors' Intentions in Chapter 11

### (i)     To Avoid Further Deterioration of the Business

79.     In Chapter 11, the Debtors have an opportunity to effectuate their plan for a quick sale of all assets with the consent and participation of the Pre-Petition Lenders and several major suppliers.  This would avoid further deterioration of the business and achieve maximum values for all creditors.  The Debtors also determined that in order to fund a lengthy restructuring process, the lender would have to undertake the funding -- not a viable option for a lengthy, precarious proceeding.

### (ii)    Support from Pre-Petition Lenders Obtained in the Form of DIP Financing

80.     After considerable negotiation and diligence, the Pre-Petition Lenders have consented to the transaction which is described in the asset purchase agreement filed with the Court.  The Pre-Petition Lenders have agreed, through the proposed debtor-in-possession financing facility, to extend financing during the Chapter 11 process only in accordance with a nine-week Budget, annexed as an exhibit to the Emergency Motion for an order authorizing the Debtors to obtain post-petition financing, and for other relief, as described below.  The financing is proposed to include a "roll-up."  This is a term required by the DIP Lender and necessary in

25

order to allow the DIP Lender to recover value herein.  The DIP Lender predicts that it may not recover near the amount of its pre-petition secured debt.  The Debtors have been unable to obtain proposals, or a commitment, for alternate financing, after reasonable attempts to do so.  It appears that no financing on more favorable terms can be obtained.

81.    An agreed Budget is filed with the Debtors' Motion to approve debtor-in-possession financing and use of cash collateral.  To undertake a non-bankruptcy resolution in favor of the Pre-Petition Lenders would eclipse all value for unsecured creditors.  Thus, the Debtors determined to file their Chapter 11 Cases with an agreed debtor-in-possession financing facility, and a Section 363 sale transaction in hand with the Purchaser, all on the first day.

(iv)    <u>Potential Causes of Action for the Benefit of Creditors</u>

82.    The filing of the Chapter 11 cases will allow a fresh look at litigation that might be commenced for the benefit of the estates.  The Debtors may maintain various claims and causes of action, summarized as follows, subject to further diligence.

<u>Kolin</u>:  As is set forth herein, the Debtors shipped custom, large screen HDTVs to SCHOT and OFE which were in turn to be sold by Kolin to various representatives of the Chinese government in the fourth quarter of 2007, and which were to be installed in the Beijing Olympic Village.  However, the shipment was never paid for by the Chinese government and arrangements were made by SCHOT, OFE and Kolin to take the units back.  Disputes arose and continue over the disposition of the inventory.  There may be causes of action against Kolin and other suppliers arising out of these circumstances, and others.

<u>Former Directors and Officers</u>:  Class actions and a derivative lawsuit have been asserted against the Debtors and their directors and officers.  The claims asserted in the derivative action concerning SBC are property of the Debtor's estate; the claims asserted

26

therein and in the class action may be examined for causes of action that may be asserted against former directors and officers. The Debtors have maintained, and continue to maintain, director and officer, and error and omission, coverage.

    <u>Avoidance Actions</u>: Chapter 5 of the Bankruptcy Code provides recovery mechanisms not available outside of the Cases. These should be explored.

    <u>Others</u>: There may be other litigation available, upon further investigation and consideration.

## H.    <u>Summary</u>

83.    As set forth in detail above, the Debtors attempted to design an internal restructuring, but this has proven impossible. The Debtors have attempted to raise capital or refinance with a new party, which has also proven impossible. The Debtors have experienced resignations off the board, replaced management and implemented staff reductions. Cost-savings have been implemented and internal controls and procedures have been improved. The Debtors have worked closely with the Pre-Petition Lenders to maintain the value of the assets pending a Chapter 11 filing and a quick asset sale to a logical purchaser which appears the only avenue available here.

84.    In order to effectuate the strategies set forth herein, and maximize values for all creditors, including unsecured creditors, the Debtors were forced to commence these Chapter 11 cases now and respectfully seek the relief set forth in the First Day Motions summarized below.

PHX 328,279,218.18

## IV.
## FIRST DAY MOTIONS

85.     Concurrently with the filing of these Chapter 11 Cases, the Debtors will be filing

a number of First Day Motions.[5] The Debtors anticipate that the Court will conduct a hearing

within a business day or two after the commencement of the Cases (the "**First Day Hearing**"),

during which the Court will entertain the argument of counsel with respect to the relief sought in

the First Day Motions.

86.     Generally, the First Day Motions have been designed to meet the immediate goals

of: (a) establishing procedures for the efficient administration of the cases; (b) continuing the

Debtors' operations during these Cases with as little disruption and loss of productivity as

possible; and (c) maintaining the confidence and support of vendors, customers, employees and

other key constituencies.   The Debtors also seek to conduct an expedited sale process, and to

present and confirm a plan at the earliest possible time.

87.     I have reviewed each of the First Day Motions, including the exhibits thereto, and

I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the

goals described above and, ultimately, will be critical to the Debtors' ability to achieve success

in the Chapter 11 Cases.

88.     The First Day Motions are identified, listed and more fully described below.

---

[5]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
relevant First Day Motion.

PHX 328,279,218.18

*Administrative Motions*

A.   **Motion of the Debtors for Order Directing**
     <u>**Joint Administration of Chapter 11 Cases**</u>

89.   SBC is the 100% holder of both other Debtors' stock, and thus they are affiliates.

Local Rule 1015-1 provides that this Court may order joint administration of affiliates without

notice or a hearing upon the filing of a motion requesting such joint administration and an

affidavit or verification establishing that joint administration is warranted.  Joint administration

of these Chapter 11 Cases (a) is warranted because the Debtors' financial affairs and business

operations are closely related, and (b) will ease the administrative burden on the Court and

parties-in-interest in these cases.

90.   The Debtors anticipate that numerous notices, applications, motions, other

documents, pleadings, hearings, and orders in these cases will affect all of the Debtors.  With

three (3) affiliated Debtors, each with its own case docket, the failure to administer these cases

jointly would result in numerous duplicative pleadings being filed and served upon parties

identified in separate service lists.  Such duplication of substantially identical documents would

be extremely wasteful and would unnecessarily overburden the Debtors, the Clerk of this Court

(the "**Clerk**"), creditors, and other parties-in-interest in these cases.

91.   Joint administration will permit the Clerk to use a single general docket for the

Debtors' cases and to combine notices to creditors and other parties-in-interest of the Debtors'

respective estates.  Joint administration also will protect parties-in-interest by ensuring that such

parties-in-interest in each of the Debtors' respective Chapter 11 cases will be apprised of the

various matters before the Court in all of these cases.

92.   The Debtors request that the official caption to be used by all parties in all

pleadings in the jointly administered cases be in the form set forth in Paragraph 10 of this

Motion.  The Debtors submit that use of this simplified caption will eliminate cumbersome and confusing procedures and ensure a uniformity of pleading identification.

93.    The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.  Each creditor and party-in-interest will maintain claims or rights it has against the particular estate in which it allegedly has a claim or right.  Indeed, the rights of all creditors will be enhanced by the efficiencies and reductions in costs resulting from joint administration.  The Court also will be relieved of the burden of entering duplicative orders and keeping duplicative files. Supervision of the administrative aspects of these Chapter 11 cases by the Office of the United States Trustee also will be simplified.

**B.    Application of Debtors for Order Pursuant to 28 U.S.C. § 156(c) Authorizing the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as Balloting, Noticing, and Claims Agent**

94.    The thousands of creditors and other parties-in-interest involved in the Debtors' Chapter 11 Cases may impose heavy administrative and other burdens on the Court and the Office of the Clerk of the Court.  To relieve the Clerk's Office of these burdens, the Debtors propose to engage Epiq as their balloting, notice and claims agent in these Chapter 11 Cases.

95.    Epiq is a Chapter 11 administrative claims consultant and analyst with experience in noticing, claims processing, data management, claims reconciliation, and distribution.  By appointing Epiq as the balloting, noticing and claims agent in these Chapter 11 Cases, the Debtors believe that the Debtors' estates and the creditors will benefit from Epiq's services and that such assistance will expedite service of Rule 2002 notices, streamline the claims administration process, and permit the Debtors to focus on their primary efforts in Chapter 11.

96.    The Debtors submit that Epiq has the expertise and is well qualified to properly send the required notices to and process the claims of creditors and other interested parties in these cases and to maintain databases and provide similar support services in the Chapter 11 cases. Epiq will follow the notice and claim procedures that conform to the guidelines promulgated by the Clerk of the Bankruptcy Court and the Judicial Conference.

97.    For all of these reasons, I respectfully request that this Court grant the relief sought on behalf of the Debtors in each of the Motions filed concurrently herewith.

***Operational Motions***

**C.    Motion of the Debtors for Order Authorizing the (A) Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Continued Use of Existing Cash Management System, and (C) Waiving Certain Investment and Deposit Guidelines**

98.    The Debtors operate a consolidated cash management system which is described in this Motion. As set forth therein, the system builds in efficiencies that should be preserved during the Chapter 11 Cases for the benefit of the secured parties as well as to keep costs and administration to a minimum, which will benefit all creditors.

99.    By the Motion, the Debtors seek an order: (a) authorizing the continued use of the Debtors' existing bank accounts and continued use of existing business forms and checks; (b) continued use of the existing cash management system; (c) waiving investment and deposit guidelines of Section 345 of the Bankruptcy Code and the United States Trustee's Guidelines; and (d) providing any additional relief required in order to effectuate the principal relief sought in the Motion. The relief requested will help ensure the Debtors' smooth transition into Chapter 11 and avoid the possible disruptions and distractions that could otherwise divert the Debtors' attention from more pressing matters during the initial days of these Chapter 11 cases. A chart and explanation of the Debtors' cash management system are included with the Motion.

31

**D.**    **Motion of the Debtors for Order (I) Authorizing Debtors to Pay (A) Certain Pre-Petition Employee Obligations, and (B) Pre-Petition Withholding Obligations, and (II) Directing Banks to Honor Related Pre-Petition Transfers**

100.    In order to enable the Debtors to retain their current employees (the "**Employees**") during this critical time, minimize the personal hardship such Employees may suffer if pre-petition employee-related obligations are not paid when due, or honored as expected, and maintain morale, the Debtors, by this Motion, seek authority, in their discretion, to pay and/or honor, as the case may be, (a) certain pre-petition claims of Employees, including, but not limited to, claims for wages, salaries, vacation, sick leave, and unpaid reimbursable expenses and certain costs and disbursements related to the foregoing (collectively, the "**Employee Compensation**"), up to the statutory cap of $10,950 per Employee, and (b) all pre-petition federal and state withholding obligations.  The Debtors further request that the Court enter an order directing all banks to honor the Debtors' pre-petition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

101.    The Employees are essential to the continued operation of the Debtors' businesses and the Employees' morale directly affects their effectiveness and productivity.  Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date.  If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid post-petition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses.  A loss of employee morale and goodwill at this crucial juncture would undermine the Debtors' stability, and undoubtedly would have a negative effect on the Debtors, their customers, the value of their assets and business, and their ability to achieve their objectives in Chapter 11.

32

**E.    Motion of the Debtors for Order (I) Authorizing the Debtors to Pay
Pre-Petition Sales and Use, Franchise, and Similar Taxes and Regulatory
Fees in the Ordinary Course of Business, and (II) Authorizing Banks and
<u>Financial Institutions to Honor and Process Checks and Transfers Related Thereto</u>**

102.    By this Motion, the Debtors seek, pursuant to Sections 105(a), 363, and 507(a) of

the Bankruptcy Code, authority to pay, in the Debtors' sole discretion, pre-petition Taxes and

Regulatory Fees owed to the Taxing and Regulatory Authorities, including, without limitation,

Taxes and Regulatory Fees subsequently determined to be owed for periods prior to the Petition

Date, in an aggregate amount (excluding amounts paid pre-petition by checks that have not yet

cleared on the Petition Date) not to exceed $80,000 which is the appropriate, aggregate

maximum sum that the Debtors currently believe will be due on account of pre-petition Taxes

and Regulatory Fees.

103.    To the extent any check issued or electronic transfer initiated prior to the Petition

Date to satisfy any pre-petition obligation on account of Taxes or Regulatory Fees has not

cleared the banks as of the Petition Date, the Debtors request the Court to authorize the banks,

when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such

checks or electronic transfers, provided that there are sufficient funds available in the applicable

accounts to make such payments.    The Debtors also seek authorization to issue replacement

checks, or to provide for other means of payment to the Taxing and Regulatory Authorities, to

the extent necessary to pay such outstanding Taxes and Regulatory Fees owing for periods prior

to the Petition Date.[6]

104.    For the reasons described in the Motion, among other things, the payment of pre-

petition Taxes and Regulatory Fees will help the Debtors avoid serious disruption to their

---

[6]    Because each of the checks or electronic transfers is readily identified as relating directly to an authorized
payment of pre-petition Sales Taxes and Regulatory Fees, the Debtors believe that checks and electronic transfers
for payments that are not authorized will not be honored inadvertently.

operations and reorganization efforts that would result from the failure to pay such taxes and fees, including the distraction and adverse affect on morale that could result from liability for nonpayment imposed upon the Debtors' directors and officers. Furthermore, nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in applicable jurisdictions, and seeking to lift the automatic stay, all of which could disrupt the Debtors' day-to-day operations, impose significant costs on the Debtors' estates, and destroy the going-concern value of the Debtors' businesses.

**F.    Motion of the Debtors for Interim and Final Orders Pursuant to
Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities
from Altering, Refusing, or Discontinuing Service, (II) Deeming
Utilities Adequately Assured of Future Performance, and (III)
Establishing Procedures for Determining Adequate Assurance of Payment**

105.    Section 366(a) of the Bankruptcy Code prevents utility companies from discontinuing, altering, or refusing service to a debtor during the first 30 days of a Chapter 11 case. Furthermore, upon expiration of such period, a utility provider cannot terminate its services if a debtor has furnished "adequate assurance of payment" within the meaning of Section 366(c)(1)(A) of the Bankruptcy Code.

106.    By this Motion, pursuant to Sections 105(a) and 366 of the Bankruptcy Code, the Debtors seek entry of the Procedures Order: (i) prohibiting their Utility Providers from altering, refusing, or discontinuing service, (ii) deeming Utility Providers adequately assured of future performance, and (iii) establishing adequate assurance of payment. A First Day Hearing and a Final Hearing will be necessary.

107.    Uninterrupted utility services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of the Debtors' Chapter 11 cases. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to

34

preserve and maximize the value of their respective estates could be severely and irreparably harmed. Additionally, lack of electricity and phone service would render the Debtors' burglar and fire alarm systems, which are necessary to maintain insurance coverage, inoperable. It is therefore critical that utility services continue uninterrupted.

108.    The Debtors believe that the Proposed Adequate Assurance is sufficient adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code. The proposed Adequate Assurance Deposits are cash deposits, a listed form of assurance of payment in Section 366(c)(1)(A)(i) of the Bankruptcy Code. The Debtors have also requested authority to use cash collateral and to obtain post-petition financing, which will enable them to pay their operating costs, including utility costs, as they come due. Debtors anticipate that this financing and the proceeds from the asset sales will provide more than sufficient funds to pay operating costs, including the Utility Services. Moreover, the Debtors have a powerful incentive to stay current on their utility obligations because of their significant reliance on utility services to maintain their business operations. These factors which the Court may (and should) consider when considering the amount of any adequate assurance payments justify a finding that the Proposed Adequate Assurance is more than sufficient to assure the Utility Providers of future payment.

**G.    Motion of the Debtors for Order Authorizing the Debtors to (A) Obtain Post-Petition Financing of Insurance Premiums and Renewals Thereof, and (B) Pay Pre-Petition Premiums, if any, Necessary to Maintain Insurance Coverage in Effect**

109.    In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, *inter alia*: general liability, worker's compensation, property, foreign liability, fiduciary liability, umbrella liability, automobiles and trucks, crime and extortion, kidnap/ransom, directors and officers liability, employment practices and inland

35

marine/cargo (collectively, the "**Policies**").[7] These Policies are essential to the preservation of the Debtors' businesses, properties, and assets, and, in many cases, such insurance coverages are required by various regulations, laws, and contracts that govern the Debtors' business conduct.

110.    The Debtors believe it is in the best interests of their estates to permit the Debtors to honor their obligations under the current insurance contracts.  Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtors' reorganization efforts.

111.    The Debtors' ability to continue making payments without any lapse is especially essential for the Policies that are paid monthly.  Currently the Debtors pay their general liability, vehicle (autos, pickups, tractors, and trailers) and workers' compensation premiums on a ten (10) month basis paid in equal monthly installments from January through October (collectively, the "**Monthly Policies**").  The Debtors do not pay any additional financing charge for this payment system.  Even a temporary suspension of the Debtors' ability to pay these Monthly Policies would create a significant risk of the Debtors losing their insurance coverage.

112.    Clearly, the Debtors will need to continue their Policies throughout the duration of these Chapter 11 cases.  The Debtors respectfully suggest that the renewal or negotiation of these Policies fall squarely within their ordinary course of business and, but for the constraints of Section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to enter into insurance contracts or employ agents to assist them in purchasing and maintaining their Policies.  To reduce the administrative burden of these Chapter 11 cases, as well as the expense of operating as debtors-in-possession, the Debtors seek the Court's authority now to

---

[7]  Vivitar is an insured under the Policies.  SBC records Vivitar's obligations for the premiums attributable to Vivitar pursuant to the  Policies.

36

renew their Policies or enter into new Policies at the conclusion of the term of the current Policies.

113.    During the week of June 23, 2008, the Debtors paid the monthly premium under the PFA due July 1, 2008.  Nevertheless, by this Motion, the Debtors also propose to pay any pre-petition premiums related to the Policies to the extent that the Debtors might determine, in their discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Policies.  Although the Debtors are not presently aware of any such premium obligations or the necessity of such payment, the Debtors seek this authority out of an abundance of caution, in recognition of the critical necessity of keeping their insurance policies in current effect, and out of concern that if the necessity for such a payment arises in the future, the passage of time while the Debtors seek and obtain the Court's authority for such a payment may have irreversible adverse consequences for the Debtors' coverage under the Policies, injuring the estates and creditors.

**H.    Motion of the Debtors for Order Authorizing the Debtors to Pay Certain Pre-Petition Mechanics' Liens and Shipping and Warehousing Charges in the Ordinary Course of Business**

114.    As part of their business operations, the Debtors rely on a variety of service providers, common carriers, shippers, truckers, and a network of warehouse facilities (collectively, the "**Lienholders**").  The services provided by the Lienholders, including the timely, reliable delivery of goods to the Debtors, and then the storage of such for later distribution to their customers, is an absolute necessity to the Debtors' ability to conduct business.  The Debtors have a reputation for reliability and dependability among their customers. Many of the Debtors' pricing policies and marketing strategies revolve around their reliability and dependability.  This reputation depends in substantial part on the timely delivery of product

37

to the Debtors' customers. In turn, the Debtors' ability to make timely deliveries depends on a successful and efficient system for receipt of the products that the Debtors sell. This supply and delivery system involves the use of reputable service providers, common carriers, shippers, truckers, and a network of warehouse facilities.

115.    It is essential for the Debtors' continuing business viability, as well as to the value of their estates, that they receive certain critical services and maintain a reliable and efficient distribution system. Because the Debtors are in many cases dependent on third parties, it is essential that their bankruptcy cases not be a reason or excuse for any third party to cease performing timely services. The Debtors' continuing business viability and the Debtors' efforts to maximize value for creditors depends on the Debtors' ability to receive certain critical services and to maintain a reliable and efficient distribution system. For example, if the Debtors are unable to receive deliveries of the supplies and products on a timely and uninterrupted basis and, therefore, they are unable to provide products to customers on a timely basis, their operations will be impeded within a matter of days, thereby causing irreparable damage to their businesses. At the very least, the Debtors will likely suffer a significant loss of credibility and customer goodwill, thereby causing substantial harm to the Debtors' businesses and their reorganization efforts.

116.    By the Motion, the Debtors seek to prevent the breakdown of their business operations, including, but not limited to, their shipping and warehouse network. They request authority to pay certain pre-petition claims and liens, including mechanics' liens and shipping and warehouse charges, as, in their business judgment, the Debtors determine is necessary or appropriate to (a) obtain release of critical or valuable goods detained in transit pending payment, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce critical

service providers to continue to provide services and shippers to continue to carry goods and make timely delivery.

**I.** **Motion of the Debtors for Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Certain Pre-Petition Obligations to Customers and to Otherwise Continue <u>Certain Customer Practices and Programs in the Ordinary Course of Business</u>**

117.    The success and viability of the Debtors' businesses, and ultimately the Debtors' ability to successfully maximize value for the stakeholders in these cases, are dependent in large part upon the patronage and loyalty of their customers and service providers. Because the Debtors continue to sell televisions to retail customers (such as Target) and to consumers via the internet, maintaining the Customer Satisfaction Programs is critical, and any delay in honoring the Debtors' obligations thereunder will severely and irreparably impair relations with their customers and service providers. Any failure to honor pre-petition Customer Satisfaction Programs may well drive away valuable customers and potential customers and impede the Debtors' contemporaneous efforts to sell substantially all of their assets, thereby harming the Debtors' efforts to maximize the value of the estates for creditors.

118.    For these reasons, permitting the Debtors to continue to honor the Customer Satisfaction Programs, is justified and essential to the Debtors' continued operations.

**J.** **Motion of the Debtors for Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code (A) Confirming the Debtors' Authority to Continue Letter of Credit Program Related to Orders Placed by Target Corporation, (B) Authorizing the Debtors to Take Related <u>Actions in the Ordinary Course of Business, and (C) Granting Related Relief</u>**

119.    By this Motion, the Debtors seek entry of an order pursuant to Sections 105(a) and 363 of the Bankruptcy Code:  (a) confirming the Debtors' authority to continue a letter of credit program related to orders placed by customers both pre- and post-petition; (b) authorizing the Debtors to take related actions in the ordinary course of business; and (c) providing any

39

related relief required in order to effectuate the foregoing. The Debtors request such relief out of an abundance of caution and to alert and provide clarity to all parties to the arrangement, to assure transparency and compliance with the Bankruptcy Code, and to assure Court authority under Section 363 in the event this arrangement could be construed as the Debtors' payment of pre-petition debt on a post-petition basis.

120.   Prior to the Petition Date, the Debtors and Target, together with Compal and TCV, facilitated the production, sale, and delivery of televisions to Target through a letter of credit arrangement.[8]

121.   Specifically, this process is initiated when Target places an order with the Debtors and, at the same time, issues a letter of credit to the Debtors in the amount of the order. The Debtors then coordinate fulfilling Target's order through one of the Foreign Suppliers and, as part of this process, assigns the Target letter of credit to the Foreign Supplier. Pending fulfillment of the Target order, the Debtors' books and records reflect both a payable owed to the Foreign Supplier for the televisions related to the Target order and a receivable owed to the Debtors by Target.

122.   Upon receipt of the Target order and assignment of the letter of credit to the Foreign Supplier as security for payment by Target, the Foreign Supplier then proceeds to order materials and manufacture the televisions ordered by Target. Once the manufacturing process is completed and the televisions are delivered to a shipping yard in Taiwan, and after the proper documentation is presented, the Foreign Supplier requests that Target's bank issue payment in the amount of the order. Once payment is received by the Foreign Supplier, the letter of credit is

---

[8]   Due to the confidential nature of the documents related to this letter of credit arrangement, such documents are not attached hereto. These documents are available upon written request to counsel for the Debtors after execution of a confidentiality agreement acceptable to the Debtors.

terminated and the Foreign Supplier remits to the Debtors the amount paid by Target less the amount invoiced by the Foreign Supplier.

123.    Because this process is a valuable part of the Debtors ordinary course of business, and because various letters of credit issued by Target, together with the associated orders for the Debtors' televisions, are still outstanding on the Petition Date, the Debtors are seeking confirmation from the Court that they can continue to perform under this valuable arrangement with regard to both pre-petition and post-petition orders placed by Target.

**K.    Motion of the Debtors for Order Authorizing and Directing on an Emergency Basis, Payment of Pre-Petition Claims of Two Essential Vendors and Service Providers**

124.    By this Motion, the Debtors seek entry of an order authorizing and directing, on an emergency basis, the Debtors to pay the pre-petition claims of two essential vendors and service providers (collectively, the "**Essential Vendors**"), in an aggregate amount not to exceed $5,500,000 (the "**Essential Vendor Cap**").    The two vendors and service providers that the Debtors propose to treat as Essential Vendors, and the amounts proposed to be paid, are:  (a) DigiMedia, $3,500,000; and (b) TCV, $2,000,000.

125.    DigiMedia, headquartered in Taipei, Taiwan, provides the technology, research and development for the Debtors' business.  DigiMedia was originally established by the Debtors and Kolin to be a key part of the Debtors' manufacturing process.  The Debtors do not currently have an ownership interest in DigiMedia.  Kolin, which still owns an equity interest in DigiMedia, and its chairman each own shares of SBC stock.  Prior to the Petition Date, Mr. John Wu and one of his family members purchased a 51% interest in DigiMedia.  Mr. Wu also controls TCV and its affiliate, the proposed purchaser of the Debtors' assets.

126.    DigiMedia is dependent upon the Debtors for its revenues and could face significant financial and operational difficulties if it is not paid by the Debtors or otherwise supported prior to closing of the proposed sale. DigiMedia provides the Debtors with critical services including: (a) research and development for the Ölevia brand name; (b) assistance in the manufacturing process; (c) performance of quality assurance, engineering, and quality control functions for contract manufacturers; (d) assistance with all new model start-ups; (e) production planning and allocation for all manufacturing; (f) purchasing sub-components for television production; (g) supplying spare parts; and (h) sourcing and procuring on behalf of contract manufacturers of most necessary components. The Debtors owe DigiMedia approximately $6,200,000 for these pre-petition services provided by DigiMedia. However, agreement has been reached with the Purchaser to pay $3,500,000 on account of DigiMedia's pre-petition claims.

127.    TCV is an independent company that provides the Debtors both with essential plastic casings for the televisions manufactured by the Debtors and with finished television sets. As discussed above, contemporaneously herewith the Debtors have filed a motion seeking to sell substantially all of their assets to the Purchaser, an affiliate of TCV.

128.    The Debtors owe TCV approximately $2,041,800 for pre-petition non-recurring engineering costs. The Debtors' operations absolutely depend upon TCV and production would essentially cease without TCV's continued production, causing the Debtors' going-concern value to be substantially reduced. Agreement has been reached to pay TCV $2,000,000 on an Essential Vendor basis.

129.    The Purchaser conditioned its offer to purchase assets of the Debtors on the making of the Motion for payment of the pre-petition claims of the Essential Vendors in the

amount of $3,500,000 for DigiMedia and $2,000,000 for TCV. To the extent the relief sought herein is denied, the purchase price for the Debtors' assets under the proposed Purchase Agreement will be reduced in a corresponding amount.

130. The amount of the Essential Claims has been calculated into and contemplated as part of the Debtors' contemporaneous request to obtain debtor-in-possession financing and to use cash collateral. The Debtors' proposed post-petition lender recognizes the critical nature of these payments and has agreed to lend funds sufficient to pay such amounts. These payments have been calculated into the budget approved by the proposed post-petition lender and are key to the agreements among the proposed post-petition lender and TCV, and would inure to the benefit of any purchaser.

131. Therefore, the Debtors request that the Court authorize the Debtors to pay DigiMedia's and TCV's Essential Claims, thereby preserving the relationship with DigiMedia and TCV while enabling the sale process to proceed.

***Post-Petition Financing, Cash Collateral and Sale***

**L.**   **Emergency Motion of the Debtors for an Order (A) Authorizing Debtors (i) to Obtain Postpetition Financing Pursuant to Sections 363 and 364 of Title 11 of the United States Code; (ii) to Grant Liens and Superpriority Claims; (iii) to Make a Partial Repayment of Prepetition Obligations; (iv) to Use Cash Collateral; and (v) to Obtain Postpetition Financing Pending Final Hearing; (B) Providing Adequate Protection; and (C) Scheduling Final Hearing**

132. The Debtors seek authority, on an interim basis, to obtain new extension of debtor-in-possession financing, use cash collateral, provide adequate protection, and make a partial repayment on the terms and conditions set forth in the referenced Motion and as proposed in the Interim Order, attached as an exhibit thereto. The Debtors request that the Court set a final hearing on the Motion at which the Debtors will request that the Court approve such relief on a final basis.

43

133.    An immediate need exists for the Debtors to obtain post-petition financing and use Cash Collateral in order to continue the operation of their business.  Without the use of such funds, the Debtors' trade creditors will cease to provide goods and services to the Debtors on credit, and the Debtors will not be able to pay their payroll and other direct operating expenses, and obtain goods and services needed to carry on their businesses.  The ability of the Debtors to finance their operations and the availability to the Debtors of sufficient working capital and liquidity is vital to the confidence of the Debtors' employees customers, and major suppliers, and to the preservation and maintenance of the going-concern values of the Debtors' estates.

134.    The Postpetition Lenders have represented that they are willing to permit the Debtors to borrower funds and use cash collateral only in the amounts and on the conditions provided for in the Motion and in the Interim Order, including on a "roll-up" basis.  The Debtors believe that, under the circumstances, the terms and conditions set forth in the Motion and in the Interim Order are fair and reasonable for the use of cash collateral, granting adequate protection, and obtaining debtor-in-possession financing.  The Debtors submit that the permanent authority to borrow funds and use cash collateral should similarly be approved upon a final hearing. Specific terms are highlighted in the Motion as required in Bankruptcy Rule 6003 and the Local Rules. The Budget is attached to the Motion and incorporated herein by reference.

135.    Prior to the Petition Date, the Debtors sought out other potential sources of financing, recognizing that virtually all their assets are subject to the senior security interests in favor of the Pre-Petition Lenders. The Debtors are unable to obtain credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code or on any other terms. The Debtors engaged in good faith and arm's length negotiations with the Pre-Petition Lenders. Based on these efforts, the Debtors entered into the Postpetition Credit Agreement.

PHX 328,279,218.18

136.    Without the DIP financing and use of cash collateral as negotiated, the Debtor's operations will come to a halt, making a sale exponentially less valuable and frustrating the Debtors efforts in Chapter 11.

**M.**    **Motion of the Debtors for Orders (I)(A) Approving Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests Pursuant to Sections 105, 363(b), (f), and (m) of the Bankruptcy Code; and (B) Authorizing the Assumption, Assignment, and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Sections 363 and 365 of the Bankruptcy Code; (II) Approving Bidding Procedures, Break-Up Fee and Other Protections in Advance of Sale; and (III) Granting Related Relief**

137.    The rationale for the sale of substantially all the Debtors' assets is set forth above. In short, there is no use to further market the assets or business of the Debtors except by notice of the sale and of the competitive bidding procedures.  Based on the foregoing, the Sale of the Purchased Assets is justified by sound business reasons and is in the best interests of the Debtors and their estates. Accordingly, pursuant to Section 363(b) of the Bankruptcy Code, the Debtors request approval of the Sale to the Purchaser as set forth herein.

138.    In accordance with the Sale of the Purchased Assets, the Debtors seek the approval of (a) certain bidding procedures and protections, and related dates and deadlines in respect of the Sale, (b) the procedures and related dates and deadlines in respect of the assumption and assignment of some or all of the Debtors' executory contracts and unexpired leases, and (c) the form of Cure Notice proposed with the Motion.

139.    Based on the foregoing, the Sale of the Purchased Assets is justified by sound business reasons and is in the best interests of the Debtors and their estates. Accordingly, pursuant to Section 363(b) of the Bankruptcy Code, the Debtors request approval of the Sale to the Purchaser as set forth herein.

45

140.    The Debtors have proposed the Sale of the Purchased Assets after thorough consideration of all viable alternatives, and have concluded that the Sale is supported by a number of sound business reasons.  The Debtors have determined that a reorganization rather than a Sale is not a viable option due to the Debtor's liquidity constraints and problematic business model.  Hence, the Debtors have determined, with the full support of the Lenders, that a Sale of the Purchased Assets as requested herein provides the best and most efficient means for the Debtors to maximize the value of their estates, and avoid further deterioration in value.

141.    As a result of the Debtors' efforts to date, the Debtors believe that the Purchaser's offer is reasonable, will constitute fair and reasonable consideration for the Purchased Assets, and will maximize value.  In the event that upon the competitive bidding process, a Qualified Bidder offers a Competing Bid that is deemed higher and/or better, such Winning Bidder shall become the Purchaser under the Purchase Agreement and shall be required to close and comply therewith.

142.    Section 363(b) of the Bankruptcy Code provides for the appointment of a consumer privacy ombudsman.  The Debtors' privacy policy dictates that it will not sell, rent or lease personal information to others.  The privacy policy appears on the Debtors' website.  Upon a sale of personally identifiable information, an ombudsman is to be appointed unless the Seller falls within the exception of Section 363(b)(1)(A).  However, in this particular case, where the number of consumer customers is *de minimis*, we respectfully seek a waiver of this provision.

46

## V.
## CONCLUSION

143.   The primary purpose of the filing of these Chapter 11 Cases is to prevent deterioration and to protect the going-concern value of the businesses operated by the Debtors while the Debtors effectuate a sale transaction, and consummate a Chapter 11 liquidating plan. In the interim, through the Motions and Applications described above, the Debtors seek to minimize certain adverse affects that these Chapter 11 Cases might otherwise have on their businesses, while honoring the spirit of the Chapter 11 process.

144.   To preserve the value of their businesses to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these Cases by minimizing the adverse impact of the filing on the Debtors' assets and operations. A sale is necessary at this time in order to maximize the Debtors' opportunities and realize any value for unsecured creditors.   All other options would eclipse such value.   For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First Day Motions and respectfully request the Court to do so.

PHX 328,279,218.18

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: July 7, 2008

GREGORY F. RAYBURN
Interim Chief Executive Officer
Syntax-Brillian Corporation,
    Debtor and Debtor-in-Possession