IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SYNTAX-BRILLIAN CORPORATION, | ) | |
| et al., | ) | Case No. 08-11407 (BLS) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | Docket Reference No. 753 |

### MEMORANDUM OPINION[1]

Before the Court is the Emergency Motion to Request The Honorable Brendan Linehan Shannon Recuse Himself From the Syntax-Brillian Case Due to Conflicts of Interests and Undeclared Prior Relationships with FTI and Silver Point [Docket No. 753] (the "Recusal Motion") filed on a pro se basis by Mr. Ahmed Amr (hereinafter "Movant" or "Mr. Amr"). The Recusal Motion asks that I recuse myself from overseeing these Chapter 11 proceedings largely on the ground that, prior to taking the bench, I represented the Debtors' primary secured creditor in an unrelated case in 2005. For the reasons set forth below, I will deny the Recusal Motion.

### JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this Motion constitutes a core proceeding under 28 U.S.C. §

---

[1] This Opinion constitutes the findings of facts and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

157(b)(2)(A) & (O).

## GENERAL BACKGROUND

The Debtors filed their voluntary petitions under Chapter 11 of the Bankruptcy Code on July 8, 2008 (the "Petition Date"). Prior to and following the Petition Date, the Debtors were engaged in the business of manufacturing and distributing flat screen televisions under the "Olevia" brand name. The Debtors' primary customers were major retail chains such as Target and Costco.

A. **The Sale Process**

The Debtors' cases were filed for the stated purpose of effecting a sale of substantially all assets under section 363 of the Bankruptcy Code. By Order dated August 8, 2008 [Docket No. 210], the Court approved certain sale procedures, as well as bid protections for the Olevia International Group ("OIG"), the proposed "stalking horse" bidder. An auction was scheduled for August 20, 2008. No competing bidders appeared, and the Court entered an Order on August 22, 2008 authorizing and approving the sale to OIG [Docket No. 317].

OIG failed to timely close the sale, and the Debtors commenced litigation [Adv. Pro. No. 08-51409 (BLS)] in this Court seeking to compel OIG to close the sale (a remedy specifically provided for under the parties' asset purchase agreement). OIG countersued, demanding return of its deposit and a declaration that it was not required to close due to changed circumstances. After a trial lasting several days, the Court ruled that OIG had

no legal right to refuse to close, and that the Debtors were contractually entitled to entry of an order requiring OIG close the transaction.

The Court entered that Order on October 10, 2008. OIG promptly fired its attorneys and refused to close. The Court ultimately imposed civil contempt sanctions against OIG and certain individuals to compel closing of the sale. As of the date hereof, OIG has neither closed the sale nor paid any of the sanctions awarded.

B. **Appointment of the Examiner**

On July 28, 2008, the Office of the United States Trustee (the "UST") moved for appointment of an examiner to investigate, among other things, substantial allegations of fraud and misconduct by the Debtors' former officers and directors. Additionally, the UST proposed that the examiner investigate prepetition business dealings between the Debtors and their Asian suppliers and business partners. The UST's motion was supported by a number of shareholders, including the Movant. In particular, Mr. Amr (a shareholder of the Debtors) argued to the Court that he had undertaken his own investigation and had uncovered substantial evidence of wrongdoing by the Debtors' prepetition management and numerous entities in the Far East.

The UST's examiner motion was vigorously opposed by the Debtors, by the Official Committee of Unsecured Creditors (the "Committee") and by Silver Point Finance, LLC ("Silver Point"), the Debtors' DIP lender and primary prepetition secured creditor.

In broad brush, the objectors contended (I) that the Debtors and the Committee could perform any necessary investigation and (ii) that these cases had neither the money nor the time to allow for a court-ordered investigation under Code § 1104. The Court overruled the objections, and by Order dated September 3, 2008, the examiner was appointed.[2] [Docket No. 366]

The examiner completed his investigation and reported back to the Court at a hearing held on October 22, 2008. The examiner reported to the Court that there was substantial reason to believe that the Debtors has been defrauded by their vendors or business partners in the Far East, and that the Debtors' prepetition management was either complicit in such wrong-doing or negligent in allowing it to occur. The examiner recommended further investigation and the commencement of litigation on behalf of the estate. On November 26, 2008, the Committee obtained from this Court authority to sue and promptly commenced an adversary proceeding against numerous parties styled: <u>Official Committee of Unsecured Creditors of Syntax-Brillian Corporation v. James Li A/k/a Ching Hua Li, Thomas Chow A/k/a Man Kit Chow, Michael K. Chan, Vincent F. Sollitto, Jr., Wayne A. Pratt, John S. Hodgson, David P. Chavoustie, Max Fang, Christopher C. Liu, Yasushi Chikagami, Shih-jye Cheng</u>, Adversary Proceeding No. 08-51830 (BLS).

---

[2] In granting the United States Trustee's motion for appointment of an examiner, I directed that the examiner meet with Mr. Amr to obtain the benefit of his efforts.

C. **The Rayburn Affidavit and the Recusal Motion**

Prior to the Petition Date, the Debtors retained FTI Consulting ("FTI") to provide business advice and crisis management. In connection therewith, Mr. Gregory Rayburn (a partner with FTI) was appointed to serve as the Debtors' Chief Restructuring Officer.

Consistent with long-standing practice in this jurisdiction, Mr. Rayburn executed a "first day" affidavit (the "Rayburn Affidavit") [Docket No. 3] at the commencement of these cases to serve as the evidentiary predicate for various motions and applications filed by the Debtors. Among other things, the Rayburn Affidavit describes Mr. Rayburn's assessment of certain factors giving rise to the Debtors' bankruptcy filing:

> 10.[] Over the past year, the Debtors have faced a series of challenges for their businesses including the failure of a customer to pay for a large order, defaults under their credit facility and constrained liquidity.
>
> 11. In order to address the issues facing the Debtors' business, the Debtors undertook a series of activities designed to recapitalize the Debtors or provide another solution for the business. Initially, the Debtors focused on a capital raise either through a PIPE transaction or by raising capital from a supplier. The Debtors's efforts in this regard were unsuccessful largely due to the business issues described in more detail in Part III of this Declaration.
>
> 12. On a parallel path to the capital raise, the Debtors undertook an evaluation of potential restructuring options with the existing lender or a sale. However, through the process of developing a business plan to support such a restructuring or sale, two

> problems quickly became apparent. First, the Debtors' cost of goods sold was simply too high for the business to make a sustainable margin. Second, the Debtors do not own or control their own technology, research and development. The technology, research and development are critical to operating the Debtors' business and, in the case of the Debtors, are owned by a third-party. These two issues resulted in the Debtors concluding that (a) a restructuring with the existing lender was not feasible, and (b) the universe of possible purchasers was relatively small as any potential purchaser would have to be in a position to solve the two problems described above.

Rayburn Affidavit at pp. 4. Mr. Rayburn goes on to describe the negotiations with OIG that led to the stalking horse bid described in Section A above.

Later in the Rayburn Affidavit, Mr. Rayburn identifies certain potential causes of action belonging to the estate:

> 82. The filing of the Chapter 11 cases will allow a fresh look at litigation that might be commenced for the benefit of the estates. The Debtors may maintain various claims and causes of action, summarized as follows, subject to further diligence.
>
> <u>Kolin</u>: As is set forth herein, the Debtors shipped custom, large screen HDTVs to SCHOT and OFE which were in turn to be sold by Kolin to various representatives of the Chinese government in the fourth quarter of 2007, and which were to be installed in the Beijing Olympic Village. However, the shipment was never paid for by the Chinese government and arrangements were made by SCHOT, OFE and Kolin to take the units back. Disputes arose and continue over the disposition of the inventory. There may be causes of action against Kolin and other suppliers arising out of these circumstances, and others.
>
> <u>Former Directors and Officers</u>: Class actions

> and a derivative lawsuit have been asserted against the Debtors and their directors and officers. The claims asserted in the derivative action concerning SBC are property of the Debtors' estate; the claims asserted therein and in the class action may be examined for causes of action that may be asserted against former directors and officers. The Debtors have maintained, and continue to maintain, director and officer, and error and omission, coverage.
>
> <u>Avoidance Actions</u>: Chapter 5 of the Bankruptcy Code provides recovery mechanisms not available outside of the Cases. These should be explored.
>
> <u>Others</u>: There may be other litigation available, upon further investigation and consideration.

Rayburn Affidavit at pp. 26-27.

On October 21, 2007, Mr. Amr filed a motion [Docket No. 527] to require Mr. Rayburn to amend the Rayburn Affidavit. As grounds for such relief, the Movant stated that certain statements in the Rayburn Affidavit quoted above, relating to problems with the Debtors' prepetition business model, are not an accurate or complete explanation of the circumstance leading up to the Debtors' bankruptcy filing. The motion demanded therefore that Mr. Rayburn revise his prior testimony to reflect the subsequent findings of the examiner that the Debtors appeared to have lost substantial sums prepetition due to fraud and mismanagement.

A hearing on that request was held on November 21, 2008, and I denied the motion. Specifically, I ruled that there was no legal basis for, or logical purpose to be served by, requiring a

re-write of the Rayburn Affidavit. I also noted that if Mr. Amr believed Mr. Rayburn committed perjury in submitting the Rayburn Affidavit, he could seek to take Mr. Rayburn's deposition under oath and examine him regarding the veracity and completeness of the statements in his affidavit.[3]

The Recusal Motion was filed on December 8, 2008. Movant correctly alleges therein that in the summer of 2005, prior to taking the bench, I served as Delaware counsel to Silver Point in the Chapter 11 case of In re aaiPharma Inc., Case No. 05-11341 (PJW). In that case, Mr. Rayburn was engaged, as a principal of FTI, to serve as Chief Restructuring Officer. As noted, I represented Silver Point, and not FTI or Mr. Rayburn, in aaiPharma matter. At bottom, the Recusal Motion contends that my failure to require Mr. Rayburn to amend his affidavit can only mean that I am biased in favor of Mr. Rayburn, FTI and/or Silver Point, presumably as a result of prior dealings in the aaiPharma case.[4]

## DISCUSSION

Rule 5004 of the Federal Rules of Bankruptcy Procedure

---

[3] The Official Committee is already investigating the events leading up to the bankruptcy filing. Accordingly, in the interests of avoiding duplication of effort, I noted that if the Movant's request for an amended Rayburn Affidavit "were ... presented to this Court as a Rule 2004 motion for an opportunity to conduct an independent examination of Mr. Rayburn, I would likely deny that or carefully constrain the circumstances under which that examination could be taken." November 17, 2008 Hearing Transcript at 41-42. [Transcript at Docket No. 700]

[4] See Recusal Motion at p. 8 ("The issue of the judge's bias towards Silver Point and FTI, to the point of granting them virtual immunity, cannot be overlooked.").

provides that 28 U.S.C. § 455 governs a bankruptcy judge and his or her disqualification from a proceeding or contested matter in which a disqualifying circumstance arises. See Fed. R. Bankr. P. 5004. It is well settled that another federal judicial disqualification statute, 28 U.S.C. § 144, applies only to district court judges, and not bankruptcy judges. See In re Norton, 119 B.R. 332, 334-35 (Bankr. N.D. Ga. 1990).

Section 455 provides that a judge "shall disqualify himself" if one or more of several enumerated circumstances are met. 28 U.S.C. § 455. The overwhelming majority of courts have concluded that this language calls for a motion to disqualify to be heard by the judge whose disqualification is sought. See, e.g., In re Martinez-Catala, 129 F.3d 213, 220 (1st Cir. 1997) ("It might seem odd that recusal issues should be decided by the very judge whose recusal is in question. But there are other considerations at work, including a desire for expedition and a concern to discourage judge shopping."). To the extent that any facts pertinent to the disqualification motion are in dispute, "factual determinations are made by the judge whose recusal is in question, and the same judge also decides whether the facts trigger disqualification, subject always to review on appeal, normally for abuse of discretion." Id.

Under section 455(a), "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Such disqualification cases are "extremely fact

9

driven," Bryce v. Episcopal Church in the Diocese of Colo., 289 F.3d 648, 660 (10th Cir. 2002), and the test for recusal is whether "a reasonable man knowing all the circumstances would harbor doubts concerning the judge's impartiality." Edelstein v. Wilentz, 812 F.2d 128, 131 (3rd Cir. 1987). The nature and legal sophistication of this hypothetical "reasonable man" fall somewhere between that of a judge and a person who is "unduly suspicious or concerned about a trivial risk that a judge may be biased." United States v. DeTemple, 162 F.3d 279, 287 (4th Cir. 1998). Under this test, a judge is required to recuse himself even when there is only "an appearance of bias, regardless of whether there is actual bias." Bryce, 289 F.3d at 659.

By contrast, section 455(b) contemplates a subjective standard and identifies specific circumstances under which a judge is required to disqualify himself or herself on account of an actual (as opposed to perceived) bias or conflict. Only one of the five sections of Section 455(b) is relevant to the case at bar. The statute calls for recusal by the judge where he has a "personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," ... 28 U.S.C. § 455(b)(1).

In the absence of a specific statute prohibiting federal judges from hearing cases involving former clients, the courts have declined to adopt such a rule or standard. In fact, it is widely accepted that judges will often be asked to hear cases involving former clients, and that such an arrangement is not

problematic unless the prior representation is related to the matter pending before the judge. See, e.g., In re Martinez-Catala, 129 F.3d at 221 (noting "many judges also sit, usually after a self-imposed cooling off period, on cases involving former clients (assuming always no current financial ties and that the judge did not work on the same or a related matter while in practice)"); Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 788 F.2d 1223, 1224 (7th Cir. 1986) (Easterbrook, J.) ("For most judges, the time will come when he is assigned to hear a case involving former clients. I believe that one year's gap between the rendition of advice to a client and judicial service in a case involving that entity is sufficient, provided the cases are sufficiently distinct."); Chitimacha Tribe of Louisiana v. Harry L. Laws Co., Inc., 690 F.2d 1157, 1166 (5th Cir. 1982) (holding the fact that a trial judge once represented Texaco, a party before his court, "does not forever prevent him from sitting in a case in which Texaco is a party").

In the present case, applying the objective standard imposed by section 455(a), I find that recusal is not required. In particular, I find that a reasonable person, fully informed of all the facts in this matter, would not harbor doubts as to my impartiality on account of my prior representation of Silver Point.[5] Likewise, applying the subjective standard imposed by

---

[5]    I note that I have never represented FTI at any time during my career in private practice.

section 455(b), I find that recusal is not required because I do not hold any bias in favor of Silver Point, FTI or Mr. Rayburn, and nor do I have any prejudice or animus toward the shareholder and creditor constituencies in these cases. My engagement by Silver Point occurred over three years ago, has long concluded and is entirely unrelated to the case at bar. Moreover, the record in this case amply reflects that I have made a number of substantial rulings adverse to, or over the objection of, Silver Point. Accordingly, I find and hold that recusal is not required under 28 U.S.C. § 455.

To be sure, I am acutely aware of the suffering these cases have wrought upon these Debtors' creditors and shareholders. No distributions on account of claims or interests have been made to date, and any potential recovery appears entirely dependent upon the successful resolution of litigation that remains in its infancy. As painful as these circumstances are for the Debtors' creditors and shareholders, it remains clear that faithful application of law neither requires, nor permits, my recusal.

An appropriate Order follows.

BY THE COURT:

Dated: January 9, 2009

Brendan Linehan Shannon
United States Bankruptcy Judge