## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | CHAPTER 11 |
|  | : |  |
| SYNTAX-BRILLIAN CORPORATION, *et al.*,[1] | : |  |
|  | : | Case No. 08-11407 (KJC) |
| Debtors | : | (D.I. 2329, 2330, 2331, 2332, 2333, 2334, 2337, 2338, 2340, 2343) |

## MEMORANDUM OPINION DENYING MOTIONS TO PROCEED
## *QUI TAM* UNDER THE FALSE CLAIMS ACT[2]

# BY:  KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the Motion of Ahmed Amr (the "Movant") to Proceed Qui Tam under the False Claims Act (D.I. 2329) (the "Qui Tam Motion"). Eleven former shareholders (none represented by counsel) filed motions in support of the Qui Tam Motion.[3] The SB Liquidation Trust and Greenberg Traurig, LLP filed objections to the Qui Tam Motion. For the reasons stated below, the Qui Tam Motion will be denied.

---

[1] The chapter 11 cases of the following debtors were jointly administered for procedural purposes only pursuant to an Order dated July 9, 2008 (D.I. 32): Syntax-Brillian Corporation, Syntax-Brillian SPE, Inc., and Syntax Groups Corporation (the "Debtors").

[2] This Memorandum Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

[3] The following individuals filed motions in support of the Qui Tam Motion: (i) Denise Warren (D.I. 2330); (ii) Gary Squibb (D.I. 2331); (iii) Rod Comer (D.I. 2332); (iv) Frank Watkus, Jr. (D.I. 2333); (v) Laura Lipton (D.I. 2334), (vi) Arthur W. Shelden (D.I. 2337); (vii) Alan Levine (D.I. 2338); (viii) Nancy Braigan (D.I. 2340); and Mark Olsen (D.I. 2343) (the "Supporting Motions").

Background

On July 8, 2008, the Debtors each filed voluntary chapter 11 petitions in this Court. On July 6, 2009, the Court entered an Order Confirming the Debtors' Second Amended Chapter 11 Liquidation Plan (the "Confirmation Order") (D.I. 1529). The effective date of the Plan occurred on July 7, 2009 (the "Effective Date") (D.I.1533). The Plan authorized the establishment of a liquidating trust (the "Liquidation Trust") and appointment of a liquidation trustee (the "Trustee") to, among other duties, hold the Liquidation Trust Assets, pursue certain causes of action, and make distributions to the Liquidation Trust Beneficiaries (i.e., holders of Allowed General Unsecured Claims) consistent with the terms of the Liquidation Trust Agreement.[4]

On the Effective Date, Class 7 Equity Interests were cancelled and holders of Allowed Equity Interests did not receive any distribution under the Plan.[5] Notwithstanding this, the Plan did provide that:

> if prior to the closing of the Chapter 11 Cases the Liquidating Trustee, in consultation with the Creditor Representatives, determines that Residual Equity Assets are available for distribution to Holders of Allowed Equity Interests (meaning that additional assets are available after satisfying in full all other pre- and post-Petition Date claims), then, upon reasonable notice to the Holders of Allowed Equity Interests as of the Equity Interest Record Date (which will be March 11, 2009), and to the United States Trustee, the Liquidating Trustee will file a motion with the Bankruptcy Court requesting approval of procedures for making distributions to the Holders of Allowed Equity Interests as of the Equity Interest Record Date. The Debtors do not believe that any assets will be available for such distributions.[6]

---

[4] The Debtors' Second Amended Chapter 11 Liquidation Plan dated March 11, 2009 (D.I. 1016) (the "Plan"), Article VI(A)(1). Capitalized terms not defined herein are defined in the Plan.

[5] Plan, Article IV(A)(7).

[6] *Id.* As of June 3, 2016, the Trustee reported that he has made a 21% distribution to holders of Allowed General Unsecured Claims. Chapter 11 Status Report, ¶12 (D.I. 2371). The Trustee also reported that he does not anticipate that Allowed Equity Interests will receive a distribution in the chapter 11 cases. *Id.* at ¶10.

On or about October 2, 2013, the Trustee entered into a Settlement Agreement Resolving Shareholder Claims (the "Shareholder Settlement") with certain former shareholders, including the Movant, to eliminate ongoing litigation expenses with certain former shareholders (the "Settling Shareholders") and to settle pending litigation. The Shareholder Settlement was not presented to the Court for approval because it was a post-confirmation settlement within the authority of the Trustee.[7] Among other terms, the Shareholder Settlement provided for a $120,000 settlement payment to the Settling Shareholders, including a $15,000 payment to the Movant. In return, the Settling Shareholders agreed to a complete release of the Estate Parties[8] from all claims and causes of action concerning, arising from or related to the Debtors, the chapter 11 cases, the Plan, the Confirmation Order, the Liquidation Trust or its assets, the Lender Trust or its assets, the Liquidation Trust Agreement, the Lender Trust Agreement, or the Trustee.

On October 24, 2013, in accordance with the terms of the Shareholder Settlement, the Joint Notice of Withdrawal of Certain Shareholder Claims and Pleadings (the "Notice of Withdrawal") (D.I. 2245), signed by, among others, the Movant, was filed with the Court. Pursuant to the Notice of Withdrawal, the Settling Shareholders (including Movant) acknowledged and agreed that:

> Neither they, nor any person or entity affiliated with or controlled by any of them, or on whose behalf any of them are acting or may act pursuant to any agreement, arrangement or applicable law, shall (i) be parties-in-interest in the Chapter 11 Cases or appear at any hearing in the Chapter 11 Cases; (ii) have any interest of any kind, whether contingent, beneficial or otherwise, in the Liquidation Trust, or (iii)

---

[7] *In re Syntax-Brillian Corp.*, No. 08-11407 (BLS), 2016 WL 2865095, *2 (Bankr. D. Del. May 11, 2016).

[8] The "Estate Parties" are defined in the Shareholder Settlement as "collectively and individually, the following persons and entities: (i) the Liquidation Trust, (ii) the Lender Trust, (iii) the Trustee, (iv) Pepper Hamilton LLP, (v) Development Specialists, Inc., (vi) Diamond McCarthy LLP, (vii) the Creditor Representatives (as such term is defined in the Liquidation Trust Agreement), in their capacities as such, (viii) all other professionals, consultants, advisors and employees retained by the Liquidation Trust, the Lender Trust or the Trustee, and (ix) each of the respective past, present and future affiliates, predecessors, successors, assigns, shareholders, officers, directors, partners, employees, members, agents, heirs, executors, administrators, attorneys, consultants, advisors, and other representatives of the persons and entities listed in (i) through (viii) of this paragraph."

hereafter acquire directly or indirectly any interest of any kind, whether contingent, beneficial or otherwise, in the Liquidation Trust. The Shareholders shall not advise, encourage or otherwise assist any person or entity in filing or asserting any claim, right, demand, pleading or allegation of any kind in the Chapter 11 Cases or against any of the Estate Parties.

On May 16, 2016, Movant filed the Qui Tam Motion in this chapter 11 case. The Supporting Motions were filed shortly thereafter. The Liquidation Trust filed an objection to the Qui Tam Motion (D.I. 2341), which was supplemented on June 3, 2016 (D.I. 2375). On June 3, 2016, Greenberg Traurig LLP also filed an objection to the Qui Tam Motion (D.I. 2372).

On May 17, 2016, these chapter 11 cases and all related adversary proceedings were reassigned to me. (D.I. 2346). I entered a Scheduling Order for the Qui Tam Motion (D.I. 2348) and held a hearing on June 16, 2016.

At the hearing, I determined that the Movant was subject to the Shareholder Settlement and the Notice of Withdrawal and did not have standing to appear or be heard in any matter in this chapter 11 case, including the Qui Tam Motion. The Movant argued that he had withdrawn from the Shareholder Settlement and that he had standing as an "SBC qui tam advocate." The language in the Notice of Withdrawal is clear. The Movant received the $15,000 payment, released the Estate Parties and, further, agreed that he is not a party in interest and cannot appear, either on his own or on someone else's behalf, in this chapter 11 case.[9]

A number of former shareholders who filed the Supporting Motions appeared at the hearing in person or telephonically, some of whom argued in support of the Qui Tam Motion. Therefore, despite Movant's lack of standing, the hearing on the Qui Tam Motion went forward

---

[9] At the hearing, I advised the Movant that if he believes that there are grounds for disputing that he is still bound by the Shareholder Settlement, such arguments must be set forth in a separate motion that is filed with the Court so that parties will have the opportunity to respond. *See* Del. Bankr. L.R. 9013-1(b).

based on the Supporting Motions, since none of the other movants are subject to the Shareholder Settlement.

Discussion

While difficult to summarize, the Qui Tam Motion asserts that the Securities and Exchange Commission (the "SEC"), the Office of the United States Trustee (the "UST"), and other governmental agencies have failed to take a role in this chapter 11 case to "collect massive penalties from all the parties that filed this abusive Chapter 11 petition" based on fraudulent numbers and documents, have ignored the Movant's forensic analyses of the Debtors' fraud, and have failed to intervene and protect the victims of the Debtors' Ponzi Scheme. The Movant asks the Court "to proceed Qui Tam" against a number of parties (including the Debtors' officers, directors, lenders, professionals and others) who received transfers during the bankruptcy case or within the two years preceding the bankruptcy filing. The Qui Tam Motion states, in part,

> While the government has slept on its mandate to recover the money stolen from shareholders and to assess penalties and file criminal charges against the multiple parties that derived economic benefits from the stolen money, the movant has spent eight years filing motions and providing the SEC, the US Trustee and the [Bankruptcy] Court with forensic evidence that has now succeeded in impeaching the testimony and affidavits that were admitted into evidence at the First Day's Hearing.[10]

The False Claims Act ("FCA") "makes it unlawful to knowingly submit a fraudulent claim to the government."[11] "The primary purpose of the FCA 'is to indemnify the government - - through its restitutionary penalty provisions - - against losses caused by a defendant's fraud.'"[12]

---

[10] Qui Tam Motion, at 3.

[11] *U.S. ex rel. Schumann v. Astrazeneca Pharm., L.P.,* 769 F.3d 837, 840 (3d Cir. 2014).

[12] *U.S. ex rel. Wilkins v. United Health Grp, Inc.,* 659 F.3d 295, 304 (3d Cir. 2011). "The FCA's 'chief purpose ... is to prevent the commission of fraud against the federal government and to provide for the restitution of money that was taken from the federal government by fraudulent means.'" *Tyson v. Wells Fargo Bank & Co.,* 78 F. Supp. 3d 360, 362 (D.D.C. 2015).

"[A] private individual, otherwise known as a relator, may bring a civil action in the name of the United States to enforce this provision of the FCA and may share a percentage of any recovery resulting from the suit."[13]   However, a relator in an FCA case cannot proceed *pro se* because "the relator represents the interests of the United States, but a lay person cannot represent another party in court."[14]

To establish a prima facie case under the False Claims Act a plaintiff must prove: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."[15]

Here, the Movant, and those individuals who filed and argued the Supporting Motions, fail to assert any facts necessary to state a claim under the False Claims Act.  The Qui Tam Motion does not allege that any party falsely asserted a claim or demand for payment *against an agent for the United States government*.   Instead, the Qui Tam Motion alleges that the *shareholders* were the victims of the Debtors' fraudulent schemes and that the Government failed to take any action to recover those "stolen" monies to repay the shareholders.  "The False Claims Act seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government."[16]  There are no allegations in the Qui Tam Motion of fraudulent activity that caused economic loss to the *government.*   Likewise, the former shareholders who filed Supporting

---

[13] *United Health Grp.,* 659 F.3d at 305 citing 31 U.S.C. §3730(b) and (d).

[14] *Tyson,* 78 F.Supp.3d at 363 citing *Georgiades v. Martin-Trigona,* 729 F.2d 831, 834 (D.C. Cir. 1984).

[15] *United Health Grp.,* 659 F.3d at 304-05 quoting *U.S. ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 242 (3d Cir. 2004).

[16] *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 184 (3d Cir. 2001).

Motions argued that they had been victims of the Debtors' fraud.[17]  They did not argue that they

are asserting claims on behalf of the United States government.[18]

Conclusion

     Because the Qui Tam Motion fails to state any claim under the False Claims Act, it will be

denied.  An appropriate Order follows.

                         BY THE COURT:

                         KEVIN J. CAREY
                         UNITED STATES BANKRUPTCY COURT

DATED:  July 13, 2016

---

[17] Judge Shannon recognized the wrongs suffered by the Debtors' shareholders most recently in his opinion issued on May 11, 2016, when he wrote:

        Syntax was the victim of a fraud, apparently perpetrated by certain members of its management team as well as its suppliers in the Far East. The Court is acutely aware of the suffering endured by Syntax's shareholders on account of the collapse of the company. The Court's sympathy, however, does not change the economic reality and legal principles in play. Under the Plan, there is not presently a return for Syntax's shareholders, and there is not likely to be a return in the future.

        Regrettably, shareholders of companies that file for bankruptcy relief often (and perhaps typically) see their interests wiped out. This is the case even where the shareholders purchased their shares in reliance upon fraudulent or misleading information: Section 510(b) of the Bankruptcy Code specifically provides that claims arising from the purchase or sale of stock in a debtor are subordinated to all other claims.

*In re Syntax-Brillian Corp.,* No. 08-11407 (BLS), 2016 WL 2865095, *2 (Bankr. D. Del. May 11, 2016)

[18] Moreover, if a claim under the False Claims Act had been properly asserted, this Court lacks jurisdiction to determine such a claim because *qui tam* suits under the False Claims Act must be heard in a federal district court.  31 U.S.C. §3732; *Schweitzer v. United States,* 82 Fed. Cl. 592, 595-96 (2008) citing *LeBlanc v. United States,* 50 F.3d 1025, 1031 (Fed. Cir. 1995) (deciding that *qui tam* actions under the False Claims Act may only be heard in the district courts).  *See also In re Resorts Int'l, Inc.,* 372 F.3d 154, 168-69 (3d Cir. 2004)(Post-confirmation, a bankruptcy court's jurisdiction is limited to matters in which "there is a close nexus to the bankruptcy plan or a proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement.").